806 F.2d 1347
 55 USLW 2438
 Maurice ARMSTER, Josefina Cabrales, Clarence Carnes, William
Clark, Nina Gorio, Patricia McCoy, Michael
Romberg, Maverick Veasey, Joseph
Walters, Petitioners,
v.
UNITED STATES DISTRICT COURT FOR the CENTRAL DISTRICT OF
CALIFORNIA, Respondent,
and
City of Riverside, City of Los Angeles, City of Rialto,
Terry Ford, Sheman Block, Sheriff of Los Angeles, Jeff
Launi, Daryl Gates, Police Chief of City of Los Angeles,
Robert Evans, Real Parties in Interest
Celine ROLERSON, Dr. Mark Rolerson, M.D., individually, Dr.
Mark Rolerson, M.D., as the natural father of
Elizabeth Rolerson, a minor, Petitioners,
v.
UNITED STATES DISTRICT COURT FOR the DISTRICT OF ALASKA, and
the Clerk of the United States District Court for
the District of Alaska, Respondents,
Volkswagenwerk A.G., a/k/a Volkswagenwerk
Aktiengesellschaft, a foreign corporation and
Volkswagen of America, Inc., a New
Jersey corporation, Real
Parties in Interest.
 Nos. 86-7354, 86-7362.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 22, 1986.
As Amended Feb. 3, 1987.
 
 Stephen Yagman, Marion R. Yagman, Yagman & Yagman, P.C., Los Angeles, Cal., for petitioners in No. 86-7354.
 Brian A. Putra, Peterson, Bracelin, Young, Putra, Fletcher & Zeder, Judith E. Bendich, Bendich, Stobaugh & Strong, Seattle, Wash., for petitioners in No. 86-7362.
 Douglas Letter, Dept. of Justice, Washington, D.C., for respondent.
 Before KOELSCH, FERGUSON and REINHARDT, Circuit Judges.
 MOTION TO VACATE FOR MOOTNESS
 REINHARDT, Circuit Judge:
 
 
 1
 Respondent United States District Court for the Central District of California, by its counsel the Department of Justice, has moved to vacate our decision filed on June 26, 1986 in these consolidated mandamus proceedings on the ground that the proceedings are now moot. We deny Respondent's motion. Respondent's counsel misunderstands the nature of the proceedings in this Court, the basis of our supervisory authority over district courts, the grounds of petitioners' prayers for the writs of mandamus, and the law governing mootness.I. Previous Litigation
 
 
 2
 In our prior decision in these proceedings, reported at 792 F.2d 1423 (9th Cir.1986), we denied petitioners' requests that writs of mandamus be issued against the District Court for the Central District of California and the District Court for the District of Alaska. The petitioners sought to prevent those courts from suspending their civil jury trials, all of which were to be heard between June 16, 1986 and October 1, 1986.
 
 
 3
 Following respondents' receipt of a memorandum sent to all United States District Judges by the Administrative Office of the United States Courts dated June 12, 1986, respondents advised counsel for petitioners that civil jury trials were being suspended. According to the Justice Department which represented the District Courts in the proceedings before us, the memorandum from the Administrative Office did not mandate that district courts suspend civil jury trials. Rather, it informed district judges throughout this nation that if they continued to empanel civil juries they would be in violation of their duties under the Anti-Deficiency Act (31 U.S.C. Sec. 1341(a)(1) (1982)). That Act prohibits federal officers or employees from incurring financial obligations in excess of appropriated funds. The memorandum was based on an action by the Executive Committee of the Judicial Conference.[1] (See Memorandum of June 12, attached as Appendix 1).
 
 
 4
 According to the Administrative Office, a $3.8 million deficit in the civil jury trials portion of the Judiciary's budget was likely to occur if a supplemental appropriation was not enacted by the Congress. In light of the perceived potential lack of sufficient funding and the alleged correlative duty under the Anti-Deficiency Act, the "only feasible short-term solution," according to the memorandum from the Administrative Office, was for the district courts to suspend jury trials from June 16 through the end of the fiscal year, September 30. The Administrative Office anticipated a budget shortfall because of Congress' earlier decision to appropriate only $43.4 million of the $46.2 million requested for annual expenses associated with, inter alia, the compensation of civil jurors. See Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, Pub.L. No. 99-180, 99 Stat. 1136, 1154 (1985); Armster I, 792 F.2d at 1425 n. 3.
 
 
 5
 The petitioners in Armster I had each made timely jury demands in the appropriate district court. Their cases were all scheduled for trial prior to the end of the fiscal year. Joseph Walters' case, for example, was trailing; it was to be the next one tried before the district judge to whom it had been assigned. On Friday, June 13, Walters' counsel was suddenly informed by the judge's clerk that the judge would not start any new jury trials until after the beginning of the next fiscal year. The clerk advised counsel that the other judges of the Central District of California would also not conduct civil jury trials until after that time. Counsel was informed that this action was necessary because insufficient funds had been appropriated to compensate jurors during the 1986 fiscal year. The clerk then asked counsel if he would be willing to waive a jury. Counsel replied that he would not. Celine Rolerson also had a jury trial scheduled. Her case was to commence on June 23 in the District of Alaska. On June 13 the district judge announced at a hearing that if the moratorium on civil jury trials were not lifted by June 18, he would strike the scheduled trial date.
 
 
 6
 In Armster I, the petitioners sought writs of mandamus to require commencement of their trials as scheduled, subject to "normal" delays. Although we recognized that the district courts had wide discretion in scheduling and rescheduling civil jury trials, we agreed with the petitioners that the suspension of the right of jury trial because of a shortfall in the national budget violated the Seventh Amendment. We should note at this point that "the right to grant mandamus to require jury trial where it has been improperly denied is settled." Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 511, 79 S.Ct. 948, 957, 3 L.Ed.2d 988 (1959) (footnote omitted). Nevertheless, in Armster I, we concluded that it was "not necessary for us to issue a writ." 792 F.2d at 1431. In declining to order the extraordinary remedy of mandamus, we observed:
 
 
 7
 We are confident ... that the [district] judges ... who are presiding over the cases that are the subject of this petition will now act in light of the principles set forth in this opinion, that they will follow their normal procedures and exercise their customary and reasonable judicial discretion in scheduling and holding civil jury trials, and that they will do so without regard to the availabilty or unavailability of appropriated funds for the payment of juror fees.
 
 
 8
 Id. We then denied the petitions without prejudice.
 
 II. The Pending Request for Relief
 
 9
 Although the Justice Department previously denied that the moratorium announced in the June 12 memorandum from the Administrative Office was mandatory, it now urges us to vacate our decision as moot because of the subsequent actions of that Office. Petitioners object most strongly.[2] The Justice Department's motion to vacate our decision states:
 
 
 10
 4. On June 26, 1986, Congress approved the Supplemental Appropriations Bill, H.R. 4515, which provides $3.8 million in supplemental funding for fees and allowances for jurors. On June 27, 1986, the Administrative Office ... rescinded its advice to suspend civil juries and informed district court judges that civil jury trials could be resumed effective immediately. On July 2, 1986, the President signed H.R. 4515.
 
 
 11
 5. As a result of the Administrative Office's action of June 27, the proceedings before this Court, which concern the constitutionality of a suspension of civil jury trials for a lack of funds, have become moot.
 
 
 12
 Respondent's Motion to Vacate for Mootness, No. 86-7354, (July 7, 1986) (footnote omitted) (emphasis added). The Memorandum of June 27, 1986 from the Administrative Office is reproduced in Appendix 2.[3]
 
 
 13
 As a matter of fact, the anticipated budget shortfall appears always to have been far more a theoretical concern than a practical reality. The funds necessary to ensure that no shortfall would occur during the fiscal year ending September 30, 1986 had already been appropriated in separate bills by the House and Senate, and the measure was in conference committee when the Administrative Office issued its initial memorandum. "Nonetheless," that Office reported in its June 12 memorandum, "it does not appear likely that consideration by a Conference Committee, acceptance of the conference report by both houses, and presidential signature can be attained prior to June 16." (The Administrative Office offered no explanation of the importance it attached to the June 16 date). The view expressed in the Administrative Office memorandum, put in its simplest terms, was that the potential risks to the public fisc took precedence over the historic institution of the civil jury. The memorandum called for the suspension of civil jury trials nationwide. Following issuance of the memorandum, no new civil jury trials were commenced before 19 of the 20 active district judges in the Central District of California, (although the record does not indicate precisely how many jury trials had been scheduled in the Central District or how many individual judges had such trials scheduled before them), and the one active district judge in the District of Alaska whose actions were brought to our attention announced that he would strike Rolerson's scheduled jury trial. Based on these facts we issued our decision holding the suspensions unlawful.
 
 
 14
 Now the Justice Department seeks to have us withdraw our opinion. It tells us that this proceeding has become moot because the projected shortage of funds that led to the issuance of Appendix I never actually occurred and a new fiscal year has begun in which there has been, thus far, no imminent threat of a similar budget crisis. Realistically, however, there is every prospect that there will be actual budgetary shortages in the future--and the erroneous and unconstitutional precedent that would exist were we to vacate our decision and permit the actions of the Executive Committee of the Judicial Conference and the Administrative Office to stand unchallenged, is that article III judges have the obligation under the Anti-Deficiency Act to suspend the right to trial by jury in civil matters whenever a budget "crunch" is projected.
 
 
 15
 III. Jurisdiction to Entertain the Petitions for Writ of
 
 Mandamus
 
 16
 The petitioners in Armster I sought writs of mandamus prohibiting the two district courts from suspending their civil jury trials because of the prospective lack of sufficient funds to compensate civil jurors. Courts of Appeal have jurisdiction to issue writs of mandamus pursuant to 28 U.S.C. Sec. 1651 (1982), popularly known as the All Writs Act. In general, peremptory writs are used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). We have previously indicated five factors to be considered in determining whether issuance of a writ is an appropriate remedy in a particular case. Bauman v. United States District Court, 557 F.2d 650 (9th Cir.1977). Those factors are:
 
 
 17
 1. Whether the party seeking the writ has no other adequate means to obtain the desired relief.
 
 
 18
 2. Whether the petitioner will be prejudiced or damaged in such a way as to be irremediable on direct appeal.
 
 
 19
 3. Whether the district court's order is clearly erroneous as a matter of law.
 
 
 20
 4. Whether the district court's order is a oft repeated error or manifests a pattern evincing a consistent disregard for the federal rules of procedure.
 
 
 21
 5. Whether the district court's order raises new, important, or unique issues, generally of first impression.
 
 
 22
 See Bauman, 557 F.2d at 654-55. See also City of Las Vegas v. Foley, 747 F.2d 1294, 1296-97 (9th Cir.1984); In re Cement Antitrust Litigation (MDL No. 296), 688 F.2d 1297, 1301 (9th Cir.1982) aff'd for lack of a quorum 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983). The Bauman factors "are not susceptible of mechanical application" and are only "a useful starting point." In re Cement, 688 F.2d at 1301. The petitions in Armster I presented "compelling factors relating to the efficient and orderly administration of the district courts" and indicia 1, 2, and 5 were clearly satisfied.[4] See id. Moreover, "[m]andamus is now routinely used to require jury trial where it has been improperly denied." C. Wright, The Law of Federal Courts 712 (4th ed. 1983) (citing Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 511, 79 S.Ct. 948, 957, 3 L.Ed.2d 988 (1959) and Dairy Queen, Inc. v. Wood, 369 U.S. 469, 480, 82 S.Ct. 894, 901, 8 L.Ed.2d 44 (1962)). See also Will v. Calvert Fire Ins. Co., 437 U.S. 655, 666 n. 7, 98 S.Ct. 2552, 2559, n. 7, 57 L.Ed.2d 504 (1978) (noting that the Beacon Theatres Court "simply concluded that it was 'not permissible' for the district court to postpone a jury trial") (citation omitted).
 
 
 23
 Some commentators have suggested a general distinction between two basic justifications for the issuance of writs: the "supervisory" authority of appellate courts to correct established practices of the district court and the "advisory" authority to review important and novel questions. See, e.g., C. Wright, A. Miller, E. Cooper, & E. Gressman, Federal Practice and Procedure: Jurisdiction Sec. 3934 at 235 (1977); Note, Supervisory and Advisory Writs Under the All Writs Act, 86 Harv.L.Rev. 595 (1973). While we need not explicitly adopt this categorization, we might characterise our decision in Armster I as being based upon our advisory capacity regarding the orderly functioning of the district courts. See Schlagenhauf v. Holder, 379 U.S. 104, 85 S.Ct. 234, 13 L.Ed. 152 (1964) (approving of writ to construe the proper application of Fed.R.Civ.P. 35); National Right to Work Legal Defense and Education Foundation, Inc. v. Richey, 510 F.2d 1239, 1243 (D.C.Cir.) (" '[A]dvisory' mandamus ... may issue to clarify novel and important questions of law ... [and is authorized] where the decision will serve to clarify a question that is likely to confront a number of lower court judges in a number of suits before appellate review is possible."), cert. denied, 422 U.S. 1008, 95 S.Ct. 2631, 45 L.Ed.2d 671 (1975).
 
 
 24
 We entertained the mandamus petitions in Armster I both because of the novel and important constitutional question presented by the suspension of civil jury trials and because it is the unfailing practice of all federal appellate courts (including the Supreme Court) to jealously guard that right. The Supreme Court has explained that writs of mandamus are appropriate to preclude denials of the right to civil jury trial, and thus obviate the need later to reverse on appeal and subject the parties to retrial. See Ex Parte Simons, 247 U.S. 231, 239, 38 S.Ct. 497, 497, 62 L.Ed. 1094 (1918) ("[T]he order was wrong and deprived the plaintiff of her right to a trial by jury. It is an order that should be dealt with now, before the plaintiff is put to the difficulties and the Courts to the inconvenience" of appeal and subsequent retrial.). Moreover, writ review serves "a vital corrective and didactic function." Will v. United States, 389 U.S. 90, 107, 88 S.Ct. 269, 280, 19 L.Ed.2d 305 (1967) (stating that "these aims lay at the core of this Court's decisions" in La Buy v. Howes Leather Co., 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), and Schlagenhauf ).
 
 
 25
 Because we were confident that the district court judges would conform their behavior to the Constitution once the relevant legal questions were clarified, we believed it unnecessary to issue an order granting an extraordinary remedy directed against them. Cf. Deen v. Hickman, 358 U.S. 57, 58, 79 S.Ct. 1, 2, 3 L.Ed.2d 28 (1958) (granting leave to file petition for mandamus but "[a]ssuming as we do that the [court] will of course conform to the disposition we now make, we do not issue the writ of mandamus."). Moreover, the practice in such extraordinary situations is often not to issue a writ initially, even where the appellate court may be inclined to do so, in order to enable the district court judge to modify his or her behavior. See Wright and Miller, Sec. 3932, at 209-11. Accordingly, although we held unequivocally that the suspension of jury trials was unconstitutional, we denied petitioners' requests for issuance of a writ.
 
 IV. Alleged Mootness of Armster I
 
 26
 Respondent's motion urging us to vacate our prior decision as moot is based upon the issuance by the Administrative Office of its second memorandum. According to that memorandum, the Administrative Office "rescinded its previous advice to suspend civil jury trials and, effective immediately, civil jury trials may be resumed." The Justice Department argues that the second memorandum moots our prior decision and, accordingly, we should expunge that decision, which serves to protect the seventh amendment right to jury trial, from the books. We deny the Justice Department's motion for three principal reasons.
 
 
 27
 First, the recent action of the Administrative Office cannot form the basis for a finding of mootness because its earlier action was not the operative subject of our decision in Armster I--even though its June 12 memorandum was the precipitating cause of the judicial actions that led to the filing of the petitions. Second, because mootness is a jurisdictional issue based upon constitutional and common law limitations, dismissals of appeals on grounds of mootness ordinarily occur before the court has issued its decision, and events occurring subsequent to a decision on the merits do not usually deprive a court of jurisdiction retroactively. Third, and finally, the resumption of jury trials by the district courts squarely falls within an exception to the mootness doctrine--the "voluntary cessation" exception. Each of the three grounds is sufficient to require us to deny the government's motion. In reaching our conclusions, we "are mindful that the 'burden of demonstrating mootness' 'is a heavy one.' ' " Williams v. INS, 795 F.2d 738, 741 (9th Cir.1986) (quoting County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). Respondent has fallen far short of meeting that burden. We now discuss each of the three grounds in turn.
 
 
 28
 First, contrary to the Justice Department's apparent understanding, the basis of our consideration of the petitions in Armster I was the action taken by the district courts, not the issuance of a memorandum by the Administrative Office. It was the district courts that ultimately were required to decide whether to empanel civil juries. They could not, under the Constitution, abdicate that responsibility to the Administrative Office. Thus, the Administrative Office's actions, in se, plainly do not constitute a relevant change in circumstance warranting the reconsideration of our initial decision in this case.[5] We do not assert here any supervisory authority over the Administrative Office. The Administrative Office neither tries cases nor empanels juries and the petitions for writs were not directed against it. Any change in conduct by the Administrative Office simply does not constitute a sufficient basis for mooting our decision regarding the constitutional obligation of the respondent district courts.[6]
 
 
 29
 Second, the Justice Department bases its argument exclusively upon cases dismissing appeals on grounds of mootness after a trial has occurred initially in the district court and prior to the time the appellate court has issued an opinion on the merits. E.g. United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). The general rule regarding dismissal of appeals on grounds of mootness is consistent with other rules of justiciability. One formulation is as follows: "when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court ... will dismiss the appeal." Matter of Combined Metals Reduction Co., 557 F.2d 179, 187 (9th Cir.1977) (quoting Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895)) (emphasis added). See also Munsingwear, 340 U.S. at 39, 71 S.Ct. at 106 (describing proper disposition of a case "which has become moot while on its way here or pending our decision on the merits."). Courts of Appeal dismiss cases that have become moot between the time of the ruling below and the issuance of an appellate decision because of the requirement that article III courts decide only "cases or controversies."
 
 
 30
 When we rendered our decision in Armster I, all the required aspects of justiciability were present: ripeness, adverseness, etc. See generally Sibron v. New York, 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968) (noting the absence of "concededly imperative policies behind the constitutional rule against entertaining moot controversies"; to wit, "abstract, feigned or hypothetical" questions; want of "diligence or fervor" in the presentation of issues; and the presence of the " 'impact of actuality' " in the case). The current procedural posture of this case is significantly different from that of all the cases cited by the Justice Department. Here, respondent does not ask that we refrain from deciding a case, but rather that we vacate a decision that we have already issued. It bases its request on the argument that, with the post-decision alteration by the district courts[7] of their conduct, the decision has now become moot.[8]
 
 
 31
 There is a significant difference between a request to dismiss a case or proceeding for mootness prior to the time an appellate court has rendered its decision on the merits and a request made after that time. Different considerations are applicable in the two circumstances. When we refrain from deciding a case on grounds of mootness, we do so based upon the limitations of our power. We do not have the constitutional authority to decide moot cases. Here, a valid decision has already been rendered.[9] In these circumstances, while we are not precluded from exercising article III power, we are likewise not prohibited from dismissing the case post hoc. Whether or not to dismiss is a question that lies within our discretion. In this case, however, we have not been presented with a sufficient justification for the exercise of that limited, discretionary power.
 
 
 32
 Were we to vacate our decision in Armster I based upon conduct occurring after its issuance, we would be depriving the petitioners of the benefit of an appellate court decision that adjudicated properly presented questions concerning their specific constitutional rights. That alone would give us considerable pause. Equally important, the Justice Department has not suggested any public or juridical interest that would warrant our withdrawal of our opinion. The fact that after our decision was issued the district courts ceased the challenged activity is, in itself, an insufficient reason to deprive this Court of jurisdiction retroactively or to compel us to recall or vacate our decision. Cf. Newhouse v. Robert's Ilima Tours, Inc., 708 F.2d 436, 442 (9th Cir.1983) (mandate may be recalled or amended "to protect the integrity of [the appellate] process" or "to prevent manifest injustice").
 
 
 33
 The cases cited by the Justice Department do not address the issue whether, or under what circumstances, an appellate decision, already issued, should be withdrawn.[10] Implicitly, the Justice Department urges us to adopt a new uniform rule, viz. when a losing party acts in accordance with an appellate court's decision before it becomes "final," that decision becomes ipso jure moot. The proposed rule is inconsistent with the approach taken by the courts with respect to administrative orders. See, e.g., NLRB v. Raytheon Co., 398 U.S. 25, 27, 90 S.Ct. 1547, 1548, 26 L.Ed.2d 21 (1970) (" '[T]he employer's compliance with an order of the [NLRB] does not render the cause moot, depriving the Board of its opportunity to secure enforcement.' ") (quoting NLRB v. Mexia Textile Mills, 339 U.S. 563, 567-68, 70 S.Ct. 826, 828-29, 94 L.Ed.2d 1067 (1950)); NLRB v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831 (1938) ("[A]n order ... lawful when made, does not become moot because it is obeyed or because changing circumstances indicate that the need for it may be less than when made.").
 
 
 34
 More important, the new rule suggested by the Justice Department would encourage manipulation of the judicial system by wrong-doers. It would allow them to seek the benefits of a favorable judicial decision but escape some of the more significant adverse consequences of an unfavorable judgment. In the case of the government, heads of administrative agencies and other public officials could as a matter of course cause the withdrawal of decisions establishing unfavorable precedents or vindicating individual rights by complying with those decisions before the mandate issues. Such a result would be inconsistent with the manner in which our system of checks and balances is intended to operate. Accordingly, we reject the Justice Department's suggestion. Cf. Ringsby Truck Lines v. Western Conference of Teamsters, 686 F.2d 720, 721 (9th Cir.1982) ("If the effect of post-judgment settlements were automatically to vacate the trial court's judgment, any litigant dissatisfied with a trial court's findings would be able to have them wiped from the books.").
 
 
 35
 In order to ensure that the mootness motion is viewed from the most favorable possible procedural standpoint, we also consider it as if it were a part of a petition for rehearing.[11] Doing so, however, does not advance the respondent's cause. Petitions for rehearing are governed by Fed.R.App.P. 40. "A properly drawn petition for rehearing serves a very limited purpose." Anderson v. Knox, 300 F.2d 296, 297 (9th Cir.1962) (adopting standard later codified in Fed.R.App.P. 40). The petition must state "the points of law or fact which in the opinion of the petitioner the court has overlooked or misapprehended." Fed.R.App.P. 40(a). The purpose of petitions for rehearing, by and large, is to ensure that the panel properly considered all relevant information in rendering its decision. A party "abuse[s] ... the privilege of making such a petition" when it seeks review of a scope greater than the limited confines of Fed.R.App.P. 40. See Anderson, 300 F.2d at 297. A panel is simply not capable of having overlooked or misapprehended "points of ... fact" occurring subsequent to its initial decision. Consideration of subsequent factual occurrences is, thus, beyond the scope of a petition for rehearing.[12] See, e.g., Goland v. Central Intelligence Agency, 607 F.2d 339, 370 (D.C.Cir.1978) (reh'g denied 1979) (denying vacation or rehearing of prior decision based upon either changed circumstances or new evidence, and noting absence of any Supreme Court or appellate court cases that would authorize such action). Subsequently issued controlling legal opinions may be considered, of course. The rationale for the consideration of such controlling authority is that the panel misapprehended the law in its original opinion and that the subsequent authority serves to reveal that earlier error.[13] Since the subsequent development here involved factual events or occurrences rather than the issuance of new controlling opinions, the mootness issue would not be properly raised even if included in a petition for rehearing.
 
 
 36
 The third reason underlying our denial of respondent's motion is that the proceedings before us fall squarely within an exception to the mootness doctrine--the voluntary cessation rule. When the conditions satisfying this exception are met, a proceeding does not become moot even though a defendant has ceased engaging in the unlawful conduct that led to the filing of the action. See, e.g., Walling v. Alaska Pac. Consol. Mining Co., 152 F.2d 812, 815 (9th Cir.1945) (The " 'voluntary discontinuance of alleged illegal activity does not operate to remove a case from the ambit of judicial power.' "), cert. denied, 327 U.S. 803, 66 S.Ct. 960, 90 L.Ed. 1028 (1946) (quoting Walling v. Helmerich & Payne, 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944)); TRW Inc. v. FTC, 647 F.2d 942, 953 (9th Cir.1981). The rule has been interpreted to apply generally in cases in which a type of judgment with continuing force, such as an injunction, is sought. Such cases do not become moot "merely because the [defendant's] conduct immediately complained of has terminated, if there is a possibility of a recurrence which would be within the terms of a proper decree." P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 110 (2d ed. 1973).
 
 
 37
 Defendants often argue, as the Justice Department does here, that the voluntary termination of allegedly unlawful activity moots the case before the court. However, as the Second Circuit observed: "The mere cessation of an unlawful activity before suit does not deprive the court of jurisdiction to provide against its resumption; a 'case or controversy' may remain to be disposed of." United States v. Aluminum Co. of America, 148 F.2d 416, 448 (1945) (L. Hand, J.) (sitting as a court of last resort pursuant to statutory grant of jurisdiction currently codified at 28 U.S.C. Sec. 2109 (1982)). See also United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897) (when allegedly illegal trade association dissolved before trial, action for injunction not moot because a similar association might be formed in the future). A change of activity by a defendant under the threat of judicial scrutiny is insufficient to negate the existence of an otherwise ripe case or controversy. See, e.g., United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (resignation from boards of directors after complaint was filed does not moot antitrust action challenging anti-competitive effect of those interlocking directorships). See also Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 260, 58 S.Ct. 863, 864, 82 L.Ed. 1326 (1938) (FTC issued cease and desist order, underlying statute was amended, defendant abrogated prior unlawful contract and conformed to requirements of the amendment. Because FTC's action was a "continuing order" whose "efficacy" was not affected by either the amendment or the defendant's altered conduct, the "[d]iscontinuance of the practice which the Commission found to constitute a violation of the Act did not render the controversy moot.").
 
 
 38
 The cessation at issue here was voluntary. In Armster I, the proceedings were directed against the actions of two district courts. As we concluded there, the district courts had a constitutional duty to continue to provide civil jury trials. The Administrative Office's memorandum could not relieve the district courts of that obligation, and the district courts could not defer to an administrative body the responsibility to determine whether jury trials must be provided.[14] It follows that the district courts' suspensions of civil jury trials constituted voluntary acts on their part. It also follows that their decisions to resume jury trials were voluntary acts. That the supplemental congressional appropriation was enacted and the Administrative Office issued a second memorandum does not affect our conclusion.[15] Thus, for purposes of the exception, the resumption of jury trials constituted the voluntary cessation of unlawful conduct.
 
 
 39
 The ultimate question to be considered in determining whether the exception is applicable is the likelihood of recurrence of the challenged activity.[16] Where there is a reasonable possibility that the unlawful conduct will recur, the mere cessation of that conduct will not render the challengedconduct immune from judicial scrutiny. The Supreme Court's "mootness cases ... have established a powerful presumption favoring adjudication" in these circumstances. Fallon, Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons, 59 N.Y.U.L.Rev. 1, 27 (1984). As the Supreme Court has stated, "[d]efendants face a heavy burden to establish mootness ... because otherwise they would simply be free to 'return to (their) old ways' after the threat of a lawsuit had passed." Iron Arrow Honor Society v. Heckler, 464 U.S. 67, 104 S.Ct. 373, 375, 78 L.Ed.2d 58 (1983) (quoting W.T. Grant, 345 U.S. at 632, 73 S.Ct. at 897).
 
 
 40
 The causa causati of the constitutional controversy we considered in Armster I--the lack of sufficient funding for the compensation of civil jurors and certain other expenses of the Judiciary--is more than likely to recur in these times of budget austerity.[17] We recognize, as did the Supreme Court in its Gramm-Rudman decision, that "Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude." Bowsher v. Synar, --- U.S. ----, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986). Congress enacted Gramm-Rudman in an effort to address these problems, at least in part. Because no branch of government is immune from that Act's requirement of substantial reductions in federal spending each year, see Pub.L.No. 99-177, 99 Stat. 1037 (1986), the prospect that budget allocations will be insufficient to permit us to continue our present level of operations is, unfortunately, quite real.
 
 
 41
 If the view espoused in these proceedings by the Justice Department were to prevail, suspensions of civil jury trials could occur towards the end of any fiscal year in which it appeared that the budget for the Judiciary would not provide sufficient funding for that part of our operations. The bare assertion by the Justice Department in its mootness motion that this situation will not recur is far from credible. Nor would it in any event be sufficient to deprive this Court of its constitutional power to adjudicate this case. See, e.g., United States v. Concentrated Phosphate Export Association, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968) ("[H]ere we have only appellees' own statement that [the challenged actions would not recur]. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellees' shoes."); Chinese for Affirmative Action v. Lequennec, 580 F.2d 1006, 1009 (9th Cir.1978) ("the record before us sheds no light on the problem, and the city's own statement of mootness cannot support an affirmance on that ground"), cert. denied, 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979).
 
 
 42
 The principle expounded in Concentrated Phosphate is particularly applicable here because the Justice Department has never conceded that the initial suspension of jury trials was unlawful. Similarly, the Administrative Office of the United States Courts still contends that a perceived budget crisis triggers a correlative duty under the Anti-Deficiency Act to suspend civil jury trials nationwide. It has long been recognized that the likelihood of recurrence of challenged activity is more substantial when the cessation is not based upon a recognition of the initial illegality of that conduct.[18] Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 43, 65 S.Ct. 11, 14, 89 L.Ed. 29 (1944) (defendant's decision to cease offering allegedly illegal contract terms two months after complaint was filed but before trial did not moot controversy where defendant failed to acknowledge illegality of conduct). See also Alton & Southern Railway v. International Association of Machinists and Aerospace Workers, 463 F.2d 872, 879 n. 13 (D.C.Cir.1972) ("a deliberate and persistent official interpretation is more likely to identify a 'recurring controversy' situation"). The likelihood of repetition of the challenged actions in the absence of an opinion by an appellate court resolving the question answered in Armster I counsels strongly in favor of the preservation of our jurisdiction and against the withdrawal of that opinion. In short, we cannot say that " 'there is no reasonable expectation ...' that the alleged violation will recur." County of Los Angeles v. Davis, 440 U.S. at 631, 99 S.Ct. at 1383 (citation omitted).
 
 
 43
 Moreover, in an issue of as great importance as this one--the legality of suspending the right to civil jury trial because of concerns regarding the public fisc--we should be careful not to preclude effective judicial review of conduct that is arguably unconstitutional unless it is abundantly clear that such a result is required.[19] Indeed, our Circuit has long held that there is a strong public interest in the court's resolving important precedential issues, a public interest that militates against a finding of mootness in cases presenting such issues. "[T]he courts have entertained and decided such cases before ... because of the necessity or propriety of deciding some question of law presented which might serve to guide the [legislative] body when again called upon to act in the matter." Boise City Irrigation and Land Co. v. Clark, 131 F. 415, 419 (9th Cir.1904) (quoted with approval in Southern Pacific Terminal v. ICC, 219 U.S. 498, 516, 31 S.Ct. 279, 284, 55 L.Ed. 310 (1911)). See also W.T. Grant Co., 345 U.S. at 632, 73 S.Ct. at 897, (the "public interest in having the legality of the practice settled[ ] militates against a mootness conclusion."); Olagues v. Russoniello, 797 F.2d 1511, 1517 (9th Cir.1986) (en banc) ("[B]ecause this case raises important ... constitutional issues, a strong public interest requires us to address the appropriateness of the Government's [actions] ") (case not moot). Clearly, the "flexible character of the Art. III mootness doctrine" encompasses consideration of the public interest in safeguarding fundamental constitutional rights. See, e.g., United States Parole Commission v. Geraghty, 445 U.S. 388, 400, 100 S.Ct. 1202, 1210, 63 L.Ed.2d 479 (1980).[20]
 
 
 44
 A finding of mootness would be particularly inappropriate in a mandamus proceeding of the type before us. The purpose of "advisory" mandamus is to provide guidance to all district court judges and not only to those who are parties to the proceeding. Our authority to provide such general institutional guidance to the trial courts is even broader than the authority we exercise when resolving public interest disputes not directly involving the functioning of the judicial system--disputes such as those involved in Boise City and Olagues. It would defeat one of the basic purposes of our advisory mandamus jurisdiction, if by voluntarily bringing their conduct into conformance with the appellate court's written directions, respondents could moot the controversy and require withdrawal of the opinion. Writ review is intended to provide district courts with precisely the kind of guidance for the future offered by Armster I. Even when the respondent ceases its challenged actions, the strong public interest in "having the legality of the challenged procedure determined" remains. Cf. Olagues, 797 F.2d at 1517. Were the Justice Department's position correct, compliance by district courts with an appellate court's instructions prior to the final issuance of a mandate would have the unintended effect of frustrating "the very expository and supervisory functions [that] an appellate court [performs]" when it determines novel and complex issues relating to the orderly and lawful operation of the district courts. See Will v. United States, 389 U.S. at 107, 88 S.Ct. at 279. See generally Part III, supra.
 
 
 45
 * * *
 
 
 46
 While we are fully sympathetic to concerns of "fiscal responsibility," the Constitution may not be suspended for want of an appropriation. The stern admonition reiterated by Chief Justice Burger, in his opinion for the Court invalidating Sec. 251 of the Balanced Budget and Emergency Deficit Control Act of 1985 (Gramm-Rudman), is one that all branches of our government must bear in mind in periods of economic turmoil:
 
 
 47
 No one can doubt that Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude, but "the fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives--or the hallmarks--of democratic government...."
 
 
 48
 Bowsher v. Synar, --- U.S. ----, 106 S.Ct. 3181, 3193-94, 92 L.Ed.2d 583 (1986) (quoting INS v. Chadha, 462 U.S. 919, 944, 103 S.Ct. 2764, 2780, 77 L.Ed.2d 317 (1983)). Although the nationwide suspension of civil jury trials might in most fiscal years be of only comparatively short duration, the interference with the seventh amendment's mandate that "the right of trial by jury shall be preserved" would nevertheless be intolerable. In short, the issue remains a live, vital and critically important one, notwithstanding the fact that fiscal year 1986 has ended.
 
 V. Conclusion
 
 49
 Because the Justice Department's argument in support of the motion to vacate our prior decision for mootness is incorrect both as to the factual predicate for our ruling and the relevant legal standards, we deny Respondent's motion.
 
 
 50
 The mere fact that the Administrative Office of the United States Courts advised district courts that in its opinion it was no longer necessary to suspend jury trials nationwide cannot moot our prior decision or compel this Court to recall the opinion we issued. It was the actions of the district courts in refusing to empanel civil juries and not the Administrative Office's that were the predicate to our decision in Armster I.
 
 
 51
 We reject the Justice Department's implicit argument that the unilateral post-decision actions of respondents and the Administrative Office serve ipso jure to deprive us of the jurisdiction we properly exercised and require us now to vacate a properly issued decision. Here, all the relevant considerations militate in favor of preserving that decision.
 
 
 52
 Finally, the circumstances here--the voluntary discontinuance of the challenged actions by the district courts, the prospects for recurrence, and the public importance of the Constitutional issues involved--satisfy the requirements of a well established exception to the mootness doctrine. The proceedings here are not moot.
 
 
 53
 Motion denied.
 
 APPENDIX 1
 
 54
 ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS
 
 Washington, D.C. 20544
 L. Ralph MechamDirector
 
 55
 James E. Macklin, Jr.
 
 Deputy Director
 June 12, 1986
 
 56
 MEMORANDUM TO ALL UNITED STATES DISTRICT JUDGES
 
 SUBJECT: Suspension of Civil Jury Trials
 
 57
 At the direction of the Executive Committee of the Judicial Conference, I am writing to advise you that, effective June 16, new civil jury trials will have to be suspended. Implementation of this action will be avoided if our pending request for a supplemental appropriation for the fees and allowances of jurors is timely approved, but the situation is such that a last-minute reprieve is by no means certain.
 
 
 58
 There are several reasons for the current financial crisis. For one thing, in the fiscal year 1986 appropriation Congress approved nearly $3 million less than was requested. At the same time, the rate of expenditures in this area has increased by reason of the activities of newly appointed judges. Finally, the Gramm-Rudman-Hollings Balanced Budget and Emergency Deficit Control Act led to the sequestration of an additional $1.8 million from this appropriation account. Because the judiciary does not have authority to transfer funds from other appropriation accounts to defer juror expenses, we are endeavoring to recoup these sequestered sums by a variety of administrative controls, such as denying jurors reimbursement for parking, restricting the provision of meals to non-sequestered jurors, and working with the Department of Justice to improve grand juror utilization. While these efforts will result in some savings, regrettably they will not be enough to offset the underlying $3.8 million deficit.
 
 
 59
 Our options for achieving further savings of this magnitude are obviously limited. Grand jury activity cannot be suspended because of the constitutional and statutory mandate for speedy trial of criminal cases; likewise, criminal defendants cannot be denied their constitutional right to a jury trial. Accordingly, to avoid a violation of the Anti-Deficiency Act, the Executive Committee of the Judicial Conference has determined that the only feasible short-term solution is to suspend jury trials in civil cases. Based upon current levels of expenditures, our Division of Financial Management has determined that, to achieve the required savings, civil jury trials will have to be suspended on June 16 through the end of the fiscal year (September 30) or until additional funds are made available.
 
 
 60
 We have pressed, and will continue to press, for supplemental funding for jury expenses. The Urgent Supplemental Appropriations Bill (H.R. 4515) includes $3.8 million in jury funds, and this bill has been approved by the House and by the Senate. Nonetheless, it does not appear likely that consideration by a conference committee, acceptance of the conference report by both houses, and presidential signature can be attained prior to June 16.
 
 
 61
 This agency will, of course, advise you promptly when the supplemental appropriation is approved, but until you receive notice from us of such approval the Judicial Conference has directed that you empanel no new civil juries from June 16 forward. Only juries which have been empanelled for the trial of a specific case prior to June 16--as well as juries which have already commenced hearing testimony or conducting deliberations--may continue to serve until those cases are concluded. As indicated, this suspension must continue in effect until we inform you that sufficient funds have been made available so as to permit the lifting of this restriction.
 
 
 62
 Finally, please note that case decisions interpreting the Jury Selection and Service Act of 1968, as amended, have determined that the use of volunteer jurors is unlawful. Accordingly, it appears that the current financial crisis cannot be met by the use of jurors who volunteer to serve without compensation.
 
 
 63
 I very much regret that this extreme action is necessary, but I trust all of you understand the unprecedented situation we face. Thank you for your cooperation and understanding.
 
 
 64
 /s/ L. Ralph Mecham
 
 
 65
 /t/ L. Ralph Mecham
 
 APPENDIX 2
 
 66
 ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS
 
 Washington, D.C. 20544
 L. Ralph Mecham
 Director
 
 67
 James E. Macklin, Jr.
 
 Deputy Director
 June 27, 1986
 
 68
 MEMORANDUM TO ALL JUDGES, UNITED STATES DISTRICT COURTS
 
 
 69
 Subject: Approval of Supplemental Appropriations Bill; Restoration of Civil Jury Trials and Juror Parking Reimbursement
 
 
 70
 I am pleased to announce that the Congress has aproved the Urgent Supplemental Appropriations Bill, H.R. 4515, and we have been assured by the White House staff that the President will sign the bill into law.
 
 
 71
 Among other provisions, this bill provides $3.8 million in supplemental funding for the fees and allowances of jurors. Accordingly, the Executive Committee of the Judicial Conference has rescinded its previous advice to suspend civil jury trials and, effective immediately, civil jury trials may be resumed. Similarly, all appropriate fees and allowances may be paid on a retroactive basis to the members of any civil juries that were empaneled during the suspension period (June 16 to present) pursuant to special court order.
 
 
 72
 In view of the savings derived from the suspension of civil jury trials, the Executive Committee has also rescinded its advice to deny jurors reimbursement for parking fees. Effective immediately, but on a prospective basis only, jurors may be reimbursed for parking fees.
 
 
 73
 In addition to funding for jurors, the urgent supplemental provides for the transfer of $8 million into the "Salaries of Supporting Personnel" and $3 million into the "Space and Facilities" appropriations. These transfers, which were derived from a projected balance in the "Salaries of Judges" appropriation and from savings achieved through Gramm-Rudman-Hollings reductions in the "Expenses of Operation and Maintenance of the Courts" appropriation, will provide for the projected shortfall in salaries of personnel staffing at the 94% level and for rental of space. This transfer of funds for "Salaries of Supporting Personnel" is sufficient to preclude the likelihood of any furlough of personnel at the end of the year.
 
 
 74
 The approved supplemental also contains $1.2 million for an additional 200 deputy clerk positions and $1.3 million for a study of the construction of the new Judiciary building. Revised allocations of clerk positions will be transmitted shortly.
 
 
 75
 /s/ L. Ralph Mecham
 
 
 76
 /t/ L. Ralph Mecham
 
 
 
 [1]
 As we noted in Armster I, the memorandum of June 12 was sent at the direction of the Executive Committee of the Judicial Conference of the United States. Although "submit[ting] suggestions and recommendations to the various [federal] courts to promote uniformity of management procedures and the expeditious conduct of court business" is among the duties of the Judicial Conference, 28 U.S.C. Sec. 331 (1982), "neither the [Justice] Department nor the district court considers the Administrative Office memorandum to be a mandate from the Executive Committee of the Judicial Conference or the Administrative Office, or to constitute an order from any entity that district judges take or refrain from taking any action." 792 F.2d at 1426. Except for judicial disciplinary proceedings, the Judicial Conference does not have binding or adjudicatory authority over the courts. See 28 U.S.C. Secs. 331, 372(c) (1982). While we generally refer throughout this decision to the Administrative Office, we are aware that the Administrative Office was responding, at least in part, to the actions of the Executive Committee
 
 
 [2]
 We do not pass on the question of the proper disposition by an appellate court when both parties, as a part of a comprehensive settlement, request that the court vacate its own or a lower court's judgment. In such situations, the court must consider its function as a private dispute resolver as well as a law-declarer. Some notable commentators suggest that a court should favor the promotion of settlements over concerns of the finality of judgments. For example, Wright and Miller argue:
 All of the policies that make voluntary settlement so important a means of concluding litigation apply. The appellee as well as the appellant may prefer settlement, and can bargain for whatever future protection he needs. It cannot be argued that the possible nonmutual preclusion interests of nonparties justify either appellate decision against the wishes of the parties, or an insistence that as a price of settlement the appellant must permit the district court judgment to support nonmutual preclusion. The parties should remain free to settle on terms that require vacation of the judgment, entry of a new consent judgment, or such other action as fits their needs.
 13A C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure Sec. 3533.10 at 432 (2d ed. 1984) (footnote omitted). In contrast to agreed private settlements, here the Justice Department seeks unilaterally to have our opinion withdrawn, over the objections of petitioners.
 
 
 [3]
 That the Administrative Office's action is the basis for the Justice Department's motion to moot our decision seems odd. Respondents' counsel characterised the initial action by the Administrative Office as being "advice" yet directs its mootness argument to the Office's subsequent actions. Counsel's internally contradictory arguments merely reflect the inconsistency of the Administrative Office's self-characterizations: on June 12 having "directed that you empanel no new civil juries" and on June 27th "rescind[ing] its previous advice " and that "jury trials may be resumed." (original emphasis removed, emphasis added)
 Moreover, the Justice Department's interpretation of the effect of the two memoranda is ironic. The government now bases its motion upon its characterization of the second memo from the Administrative Office as a substantive act warranting our reconsideration. But in its argument before this Court on June 19, the Justice Department conceded that "[t]here is no mandate in that memorandum [of June 12].... This memorandum tells them what the situation is.... [T]his should not be characterized as a mandate from the ... Judicial Conference." Armster I, 792 F.2d at 1426 n. 6 (quoting oral argument by the Justice Department). We assume that the inconsistent positions adopted by the Justice Department result largely from the complexity of the factual and legal issues involved and not from any bad faith on the part of the Justice Department in its dealings with this Court.
 
 
 [4]
 We also believe that indicium 3 was satisfied but because satisfaction of indicia 1, 2, and 5 is more than sufficient to justify issuance of a writ, we need not rely on that conclusion. As to indicium 4, we have previously noted that it is most unlikely that that indicium and indicium 5 could both be satisfied in a single case:
 Rarely, if ever, will the final two Bauman guidelines both be applicable in a given case: the fourth contemplates a case presenting an oft-repeated error, and the fifth a case presenting a novel question. Where one of the two is present, the absence of the other is of little or no significance.
 United States v. Harper, 729 F.2d 1216, 1222 (9th Cir.1984).
 
 
 [5]
 Nowhere in the Motion to Vacate for Mootness (July 7, 1986) or in the Reply of Respondent in Support [of] Motion to Vacate for Mootness (July 31, 1986) does the Justice Department refer to or rely on the actions of the district courts subsequent to the issuance of our decision on June 26, 1986. Nor is there any indication in the Justice Department's papers that the two respondent District Courts have ceased the challenged actions (although we assume that they have). The papers filed appear very carefully to avoid any mention of the district courts. Accordingly, we can only conclude that the Justice Department has deliberately limited the basis for its contention that the proceedings are moot to the actions of the Administrative Office
 Because the Justice Department appears to have made a deliberate choice not to rely on the actions of the district courts, and since the actions of the Administrative Office are not sufficient to sustain a finding of mootness in this proceeding, the Motion to Vacate for Mootness must be denied. Accordingly, we need not reach the second or third grounds infra. Nevertheless, we do so because they offer important alternative bases for our decision. In order to put the Justice Department's position in the best possible light, we will, for purposes of the remaining two issues, treat its motion as if the proper argument--that the district courts are no longer refusing to afford civil jury trials--had been raised.
 
 
 [6]
 It is important to keep the concepts of action and justification distinct. The Administrative Office (and the Executive Committee of the Judicial Conference) provided the motivation and rationale for the actions of the district courts in suspending civil jury trials. We held in Armster I that a suspension of the right to jury trial based upon a want of appropriation and a desire to avoid potential (although potentially dubious) violation of the Anti-Deficiency Act abridged the constitutional protection of the right to trial by jury. We scrutinized the actions of the district courts and used the memorandum from the Administrative Office as evidence of the rationale for those actions. Notwithstanding counsel for the district courts' adoption of the rationale offered by the Administrative Office as a justification for its clients' actions, that Office's subsequent change of position is, without more, of no legal significance. It was the actions of the district courts, viz. the unconstitutional denials of petitioners' right to civil jury trial, that were at issue in Armster I
 
 
 [7]
 While the Justice Department's motion is based exclusively upon the new memorandum sent out by the Administrative Office, we here discuss the issue as if the more pertinent argument had been made, namely that the actions of the district courts following receipt of the new memorandum mooted the controversy. See supra note 5
 
 
 [8]
 Accordingly, we find ourselves in a posture totally different from that of the Eighth Circuit which recently dismissed an application for mandamus that was based upon essentially the same facts as were present in Armster I. At the time the purported fiscal crisis was resolved, the Eighth Circuit had issued an emergency stay but had neither considered nor decided the merits of the proceeding pending before it. Debes v. Kawasaki Motors Corporation, 802 F.2d 462 (table) (8th Cir.1986)
 
 
 [9]
 The fact that the ministerial act of issuing the mandate remains or that we may be asked to reconsider our decision does not affect our conclusion. As we note infra, petitions for rehearing serve the limited purpose of enabling a panel to correct an error in its decision. At the time it considers a petition for rehearing, the court has already exercised its constitutional power
 
 
 [10]
 It is also worth noting that all the cases cited by the Justice Department involved appeals from lower courts. Unlike appeals, mandamus cases are 'original' proceedings "auxiliary to [our] appellate power." United States v. Mayer, 235 U.S. 55, 65, 35 S.Ct. 16, 18, 59 L.Ed. 129 (1914). See also McClellan v. Carland, 217 U.S. 268, 279, 30 S.Ct. 501, 503, 54 L.Ed. 762 (1910)
 
 
 [11]
 Although we consider the Justice Department's Motion to Vacate for Mootness as if it were filed as a part of a petition for rehearing, we do so without prejudice to the filing of a subsequent petition for rehearing, in accordance with the order we have previously issued
 
 
 [12]
 The fact that a case may have become moot subsequent to the appellate court's decision does not preclude a party from seeking review in the Supreme Court. The basis for the Supreme Court's determination, however, would be the original decision of the panel, and not a suggestion of subsequent mootness. Cf. Commodity Futures Trading Comm'n v. Board of Trade of Chicago, 701 F.2d 653, 657 (7th Cir.1983) (Posner, J.) (noting that the Supreme Court seemingly has "accepted" the suggestion "to limit the practice [of vacatur] to cases where it would have granted the petition for certiorari had the case not become moot."). If a case is determined to be moot, the Supreme Court may, at its discretion, dismiss a petition for certiorari that it would have otherwise granted. See generally United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950) (discussing general procedure for vacatur after a finding of mootness). An appellate court exercising discretionary jurisdiction (e.g. certiorari) does not have the same obligation regarding mootness as does an appellate court exercising mandatory jurisdiction (e.g. an appeal from a district court). In the latter situation, when the mootness test is met, the court should generally vacate the decision below (rather than consider the merits of a case it has not theretofore decided) regardless of its view on the merits of the undecided case. See, e.g., Aguirre v. S.S. Sohio Intrepid, 801 F.2d 1185, 1189 (9th Cir.1986) ("Because mootness is an element of justiciability and raises a question as to our jurisdiction, we consider the matter sua sponte."); Matter of Combined Metals Reduction Co., 557 F.2d at 189 ("[C]ases dealing with appeals from denials of injunctions ... stand for the proposition that where an act or event sought to be enjoined has been performed or has occurred, an appeal from the denial of the injunction will be dismissed as moot."). In the case of discretionary appellate jurisdiction, unless the court would have decided to review the case on the merits had it not become moot, it should simply decline to exercise its discretionary jurisdiction. See Commodity Futures, 701 F.2d at 657. Cf. Mintzes v. Buchanon, 471 U.S. 154, 105 S.Ct. 2006, 2007, 85 L.Ed.2d 120 (1985) (Burger, C.J., dissenting from memorandum) ("In my view, the Court has a higher duty when it learns that a case has become moot after it has granted review than when it discovers that a case in which review is being sought has become moot.") (emphasis omitted)
 
 
 [13]
 We do not intend by our statement in the text to express any view as to the circumstances under which subsequently issued decisions are "controlling." See, e.g., Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355-56, 30 L.Ed.2d 296 (1971) (identifying factors to be considered for retroactive application of new decision)
 
 
 [14]
 We were advised at oral argument that some district judges across the country chose not to follow the Administrative Office's advice
 
 
 [15]
 In addition, our conclusion is not affected by the fact that jury trials were resumed at a time subsequent to the date of our decision. First of all, the mandate still has not issued in Armster I. Cf. Raytheon, 398 U.S. at 27, 90 S.Ct. at 1548 (employer's compliance with NLRB order before that order was enforced by an appellate court does not moot controversy). Second, the proceedings did not result in any order directed against the district courts. Third, it is not clear that the district courts' actions were in response to our decision in Armster I, rather than to the "advice" of the Administrative Office in the memorandum it issued the day after Armster I was filed. We have no way of knowing why the district courts that are respondents here resumed jury trials, although we assume that district courts across the nation all terminated their suspensions of seventh amendment rights at approximately the same time. In either event, we conclude that the resumption was voluntary
 
 
 [16]
 Although we hold here that the district courts' resumption of jury trials constituted voluntary acts for purposes of the "voluntary cessation" rule, it is not clear that "voluntariness" is in itself a separate requirement for the satisfaction of that test. The Supreme Court has recently articulated a somewhat different formulation of the "voluntary cessation" rule. In cases of the cessation of challenged activity, a court must determine whether a "live case or controversy" remains. In County of Los Angeles v. Davis, 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979), the Supreme Court in discussing the voluntary cessation cases, formulated the test as follows:
 jurisdiction properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that "there is no reasonable expectation ..." that the alleged violation will recur ... and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.
 Id. at 631, 99 S.Ct. at 1383 (citations omitted). No mention was made of the voluntariness of the cessation by the defendant. Under this standard, it appears that the voluntariness of the cessation is relevant to the issue of the likelihood of recurrence, i.e., the likelihood is increased if the cessation of conduct was merely a voluntary choice by the defendant and the defendant remains free to change its position at will. On the other hand, where the defendant is required to cease conduct permanently, it is apparent that there is no likelihood of recurrence. Then again, if the order or other external act requiring cessation is only temporary in nature, the likelihood of recurrence is far greater.
 While we find the Davis formulation provides a simpler and more logical standard than some of the earlier statements of the voluntary cessation exception, in view of our finding that the cessation here was voluntary, there is no need to determine here whether voluntariness remains a separate component of the exception.
 
 
 [17]
 As Chief Judge Jack Weinstein of the Eastern District of New York observed in his address before the American Bar Association's Annual Meeting, "[a]t no time has adequate funding of the [judicial] system been more essential or in greater danger than at present." J. Weinstein Adverse Effect of Budget Cuts on Justice in the Federal Courts, ABA Panel on Gramm-Rudman-Hollings: The Impact of Federal Budget Cutting on the Practice of Law and the Justice System (Aug. 10, 1986)
 
 
 [18]
 As noted, the district courts have been represented throughout these proceedings by the Justice Department. They have made no independent presentations of their views other than in a brief statement by the Chief Judge of the Central District of California at the time of oral argument. In his statement, Chief Judge Manuel Real did not indicate any disagreement with the position of the Justice Department regarding the suspension of jury trials for budgetary reasons
 
 
 [19]
 Judge Weinstein described the nationwide suspension of civil jury trials as an "astounding and shocking interruption of the constitutional right to trial by jury." He continued by stating that the "nearest analogy I can recall was suspension of the right of habeas corpus during the Civil War." J. Weinstein, Adverse Effect of Budget Cuts on Justice in the Federal Courts, note 17 supra
 
 
 [20]
 Although analogous, the "voluntary cessation" exception is different from the better-known "capable of repetition, yet evading review" exception to the mootness doctrine. See Southern Pacific Terminal v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) The latter exception permits judicial review of actions (ordinarily administrative orders) that are of short duration and that, generally, expire by their own terms. See generally Sample v. Johnson, 771 F.2d 1335 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1206, 89 L.Ed.2d 319 (1986). Because this case falls within the voluntary cessation exception, we need not consider whether it would also satisfy the Southern Pacific exception