**PACIFIC WEST CABLE COMPANY, Plaintiff,**

**v.**

**CITY OF SACRAMENTO, CALIFORNIA, a municipal corporation; and County of Sacramento, California, a municipal corporation, Defendants.**

Civ. No. S–83–1034 MLS.

United States District Court, E.D. California.

Aug. 13, 1987.

**40.** EEOC Compliance Manual Secs. 1112.4.

Harold R. Farrow, Robert M. Bramson, Siegfried Hesse, Farrow, Schildhause & Wilson, Oakland, Cal., Richard Alexander, The Boccardo Law Firm, San Jose, Cal., for plaintiff.

Michael A. Small, Kathleen M. McGinnis, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., W. Young, K. Broerick, Preston, Thorgrimson, Ellis & Holman, Washington, D.C., James Jackson, Sacramento City Atty., L.B. Elam, Deputy County Counsel, Sacramento County, Sacramento, Cal., for defendants.

Stephen L. Goff, Boutin, Lassner, Gibson, Terry & Delehant, Sacramento, Cal., for amicus curiae.

## MEMORANDUM DECISION, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

MILTON L. SCHWARTZ, District Judge.

Jury trial of this action commenced on March 23, 1987. After 29 days of trial, the matter was submitted to the jury on June 3 on a series of special verdicts. The jury returned twenty-two of the special verdicts on June 5. After entering those verdicts, the court asked the jury to continue deliberating on the remaining special verdicts. On June 9, the jury notified the court that it had reached unanimous agreement on eight of the special verdicts but were hopelessly deadlocked on the remaining five verdicts. The court accepted and entered the additional eight verdicts and then discharged the jury.

The court conducted one additional hearing and received two sets of briefs (one prior to the hearing and one after) on the issue of the proper judgment, if any, to be entered on the special verdicts. The matter has now been submitted. The following constitutes the court's judgment, including its analysis and conclusions, on the jury's special verdicts and in response to plaintiff's request for injunctive relief.

## I. BACKGROUND

### A. The Issue of the Franchise [1]

In November of 1981, the Sacramento City Council and County Board of Supervisors enacted substantially identical cable television [2] ordinances (the "cable television ordinance"). The ordinance established the exclusive procedure for awarding cable television franchises. Under the cable television ordinance, any such franchise is deemed to constitute a contract between the franchisee and the Sacramento Metropolitan Cable Television Commission (the "cable commission"), which is a joint powers authority formed pursuant to California law by defendants and two other cities. Furthermore, the possession of a franchise is a requirement for access to utility easements and underground conduits in Sacramento.

Pursuant to the provisions of the cable television ordinance, a request for proposals for the award of a cable television franchise within the city and county was issued. Defendants received four proposals. After conducting various meetings and hearings on the proposals and considering the reports prepared by the consultant retained by the county, defendants selected a firm called United Tribune Cable of Sacramento as the tentative franchisee.

---

1. Much of the information is taken from the stipulated statement of facts. A slightly modified version of this statement of facts was read to the jury as jury instruction number 15.

2. Cable television companies may distribute, among other things, news, information and entertainment to viewers. It does so by transmitting electronic signals to and from a central location (a "head end") through cables to the television sets of subscribers. These cables are attached to public utility poles or placed in underground conduit.

Further public hearings, meetings and negotiations ensued on the precise terms and conditions of the franchise to be awarded United Tribune. However, when defendants passed resolutions offering the franchise to United Tribune, it declined to accept the offer. As a result, defendants issued a second request for proposals in July of 1983.

In August 1983, plaintiff, Pacific West Cable Company, was formed as a partnership by and between Joseph Benvenuti and D. Bruce Fite. A representative of plaintiff thereafter paid for and obtained business licenses from defendants in the name of Pacific West Cable Group. Those licenses indicate that the nature of the licensee's business is cable television. Also in August 1983, a representative of plaintiff had conversations with Pacific Telephone and Telegraph Company concerning pole attachment services; the representative also had conversations with one or more of defendants' employees and with a representative of the cable commission concerning authorization to build and operate a cable television system.

In September, plaintiff responded to the request for proposals with a five-page letter in which it requested all of the necessary licenses to operate and construct a cable television system in Sacramento. Plaintiff expressed its willingness to comply with "lawful police power regulations," but refused to tender the non-refundable filing fee. Unlike the other four firms responding to the request for proposals, each of which submitted voluminous information about itself and its proposed system, plaintiff provided only minimal information about its identity, financial resources and proposed programming.

Defendants held additional meetings and public hearings. The cable commission issued a preliminary report concerning the four proposals submitted in response to the July 1983 request for proposals and the letter from plaintiff's attorney. After one

or more additional hearings, the cable commission issued its final report. Shortly thereafter, defendants offered a cable television franchise to Cablevision of Sacramento,[3] which offer was accepted.

On or after December 8, 1983, defendants received a letter from plaintiff concerning the issuance of an additional cable franchise. The city attorney and county counsel responded by letters dated January 25, 1984 and February 1, 1984, respectively. Plaintiff's attorney responded to those letters on February 24, 1984. The city attorney and county counsel answered by letters dated March 30, 1984 and April 6, 1984, respectively.

B. *This Suit*

When defendants persisted in their refusal to issue plaintiff a cable television franchise, plaintiff filed suit on September 9, 1983, alleging that defendants' refusal to issue it a franchise violated the first and fourteenth amendments to the United States Constitution, sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and article I, section 2 of the California Constitution.

Plaintiff moved for a preliminary injunction that would have allowed it to lay its conduit along with the cables being laid by the franchisee. The motion was denied on the ground that plaintiff had failed to show irreparable injury. *See Pacific West Cable Co. v. City of Sacramento*, 762 F.2d 1018 (9th Cir.1985) (mem.) (affirming denial). Plaintiff also moved for a second preliminary injunction to enjoin defendants from denying it the opportunity to build and own a cable television system; this motion was also denied. *See Pacific West Cable Co. v. City of Sacramento, California*, 798 F.2d 353 (9th Cir.1986) (affirming denial).

Finally, the court dismissed plaintiff's antitrust claims for failure to state a claim upon which relief may be granted. *See Preferred Communications v. City of Los*

3. In January of 1985, defendants amended the franchise to permit (among other things) Scripps Howard Cable Company of Sacramento, which was one of the partners in Cablevision, to succeed to the partnership interest of two of the

other partners. Defendants also permitted the name of the partnership to be changed from Cablevision of Sacramento to Sacramento Cable Television.

*Angeles,* 754 F.2d 1396, 1411–15 (9th Cir. 1985), *aff'd on other and narrower grounds,* 474 U.S. 979, 106 S.Ct. 380, 88 L.Ed.2d 333 (1986).

## II. SPECIAL VERDICTS

At the close of evidence and final argument, the case was submitted to the jury on general instructions and eighteen special verdicts (many of which had several subparts). *See* Fed.R.Civ.P. 49(a).[4] The court used special verdicts over the objection of plaintiff, which argued that it was entitled to a general jury verdict and instructions on the law.

### A. *Advantages of Special Verdicts*

There were several advantages to using special verdicts in this case. The general verdict is usually either all wrong or all right because it is an inseparable and inscrutable unit. 5A Moore's Federal Practice ¶ 49.02 (2d ed. 1986) (quoting Sunderland, *Verdicts, General and Special,* 29 Yale L.J. 253, 259 (1920)). Special verdicts, on the other hand, isolate fact findings in such a way as to allow reviewing courts to make determinations as a matter of law while preserving the jury's role as a fact finder. Brown, *Federal Special Verdicts: the Doubt Eliminator,* 44 F.R.D. 338, 346–48 (1967).

For this reason, special verdicts are a valuable tool when the law is uncertain or in a state of development; special verdicts minimize the need for, and scope of, a new trial in the event of an error of law or a misapplication of law to the facts. *Id.* at 342, 348; *see also* Wright and Miller, *Federal Practice and Procedure,* § 2505 at 494–95 (1971); Wright, *The Use of Special Verdicts in Federal Court,* 38 F.R.D. 199, 202 (1965). The Second Circuit endorsed the use of special verdicts in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980):

> We note *en passant,* however, that in large and complex cases such as this, involving many novel legal issues, the better practice would have been to require special verdicts or the submission of interrogatories to the jury pursuant to Fed.R.Civ.P. 49. In that way the right to a jury trial of all factual issues is preserved while the probability of a laborious and expensive retrial is reduced. *See SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983, 988–90 & nn. 13, 15 (D.Conn.1978), *remanded on other grounds,* 599 F.2d 32 (2d Cir.1979). Certainly the already difficult task of reviewing a case of this magnitude would have been eased somewhat for this court if we knew precisely what the jury's findings were on several specific factual issues.

*Id.* at 279; *see also Envirex, Inc. v. Ecological Recovery Associates, Inc.,* 454 F.Supp. 1329, 1339–40 (M.D.Pa.1978), *aff'd,* 601 F.2d 574 (3d Cir.1979) (special verdicts are preferred in complicated cases). The Ninth

---

**4.** The use of special verdicts is authorized by Federal Rule of Civil Procedure 49(a), which provides:

> The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

There has apparently been no question as to the constitutionality of Rule 49. *Nollenberger v. United Airlines, Inc.,* 216 F.Supp. 734, 737 (S.D. Cal.1963) (citing *Walker v. New Mexico & So. Pacific R.R. Co.,* 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897), *rev'd on other grounds sub nom., United Airlines, Inc. v. Wiener,* 335 F.2d 379 (9th Cir.), *cert. dismissed, sub nom., United Airlines, Inc. v. United States,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); *see also* 5A Moore's Federal Practice ¶ 49.01[3] (2d ed. 1986).

Circuit has also approved the use of special verdicts as facilitating its review for harmless error. *See Pacific Greyhound Lines v. Zane,* 160 F.2d 731, 737 n. 6 (9th Cir. 1947).

The court is especially concerned about the possibility of legal errors in this case inasmuch as the Supreme Court has explicitly declined to decide the legal issues raised by cable television franchising in the absence of a fully developed factual record, *City of Los Angeles v. Preferred Communications, Inc.,* 106 S.Ct. at 2037–38, even though it did note that where speech and conduct are joined in a single course of action, first amendment values must be "balanced" against competing societal interests. *Id.* at 2038 (citing to *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805–07, 104 S.Ct. 2118, 2128–30, 80 L.Ed.2d 772 (1984), and *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672, *reh'g denied,* 393 U.S. 900 (1968)).

The Ninth Circuit also relied on *Vincent* and *O'Brien* in holding that a cable company's first amendment claims should not be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Preferred,* 754 F.2d at 1402. In so doing, the Ninth Circuit did not explain what the relationship of the lines of inquiry used in *Vincent* and *O'Brien* should be in the cable television franchising context, except to say that its conclusion after applying *O'Brien* is "aided" by the public forum doctrine applied in *Vincent* and other cases. *See id.* at 1407.

The challenges presented by the developing state of the law are compounded by the difficulty of determining what constitutes a question of law. The distinction between questions of fact which must be resolved by the jury and questions of law which must be resolved by the court is an elusive one in first amendment jurisprudence. *See generally* Parker, *Free Expression and the Function of the Jury,* 65 Bos.L.Rev. 483 (1983). For example, the Supreme Court has struggled with the distinction between law and fact in applying the test for "actual malice" under *New York Times*

*v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), in defamation cases. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 498–512, 104 S.Ct. 1949, 1958–65, 80 L.Ed.2d 502, *reh'g denied,* 467 U.S. 1267, 104 S.Ct. 3561, 82 L.Ed.2d 863 (1984).

The Supreme Court and Ninth Circuit have also both held that the balancing of interests which occurs in cases in which an employee is discharged for allegedly exercising first amendment free speech rights is one of law. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 150 n. 10, 103 S.Ct. 1684, 1690 n. 7, 1692 n. 10, 75 L.Ed.2d 708 (1983); *Loya v. Desert Sands Unified School District,* 721 F.2d 279, 281 (9th Cir.1983). In fact, the Ninth Circuit has held that it is error for a trial court to leave the balancing to the jury. *Loya,* 721 F.2d at 281–82; *see also Keller v. City of Reno,* 587 F.Supp. 21, 23 n. 4 (D.Nev.1984). This has prompted some courts to conclude that the extent of protection afforded by the first amendment is ultimately a question of law and that the jury's function is to find the underlying facts to which the legal standard is ultimately applied. *Kim v. Coppin State College,* 662 F.2d 1055, 1062 (4th Cir.1981) (cited in *Keller,* 587 F.Supp. at 23 n. 4); *but see Joyner v. Lancaster,* 815 F.2d 20, 23 (4th Cir.1987) (jury has no role to play; entire matter for court determination).

The use of special verdicts enables the jury to find these underlying facts and then allows the court to apply the law to the facts as found. *See Quaker City Gear Works, Inc. v. Skil Corp.,* 747 F.2d 1446, 1453 (Fed.Cir.1984) (citing 5A Moore's Federal Practice, § 49.02 at 49–8 (2d ed. 1984)), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985). This procedure assigns to the trial judge the responsibility of applying appropriate legal principles to the facts as found by the jury; the jury need not be instructed on the legal principles which the judge applies to the facts. 5A Moore's Federal Practice ¶ 49.02 (2d ed. 1986). Special verdicts thus eliminate the necessity of complicated instructions on the law, *R.H. Baker & Co. v. Smith–Blair, Inc.,* 331 F.2d 506, 511 (9th Cir.1964) (quot-

ing *Moore*'s with approval), instructions which, in this case, may result in the jury performing tasks which must be performed by the judge. Because of the uncertainty in the judge/jury division of labor, special verdicts assure that the jury does not impermissibly decide a question of law. *See* Weiner, *The Civil Jury Trial and the Law–Fact Distinction*, 54 Cal.L.Rev. 1867, 1867–68 (1966) (referring generally to Coke's dichotomy and the respective provinces of judge and jurors in a civil case); *but see* Parker, *supra*, at 550–56 (special interrogatories under Federal Rule of Civil Procedure 49(b) represent an appropriate "middle course" between the general and special verdict procedures).

### B. *The Jury's Special Verdicts*

The special verdicts themselves, together with the jury's answers, are attached as appendix A. The following is a narrative summary of the jury's findings.

The jury found that plaintiff had the technical and financial capabilities to construct and operate a cable television system in the Sacramento metropolitan area, even though they determined under the instructions given them that no amount of damages should be awarded to plaintiff. The jury also found that defendants had not left open ample alternative channels of communication for plaintiff, and persons like plaintiff, who wish to express their views.

As for defendants' justifications for limiting access to the cable television market, the jury concluded that the capacity of the public rights of way and utility easements in Sacramento are not limited to any significant degree and that the easements and rights of way had sufficient room for all cable companies who wanted to use them or who might want to use them in the future. The jury also rejected defendants' contention that the construction and operation of a cable television system cause significant disruption in the use of public or private property; in addition, the jury concluded that the construction and operation of a cable television system did not cause significant safety hazards for both the public and workers or noise, visual clutter, environmental and/or aesthetic problems. Even so, the jury said that defendants did not use these problems as a pretext for justifying their franchising process.

As for whether cable television is a natural monopoly, the jury found that it was not. In other words, the jury was persuaded that "head-to-head" competition is likely to occur and endure in the Sacramento market. Moreover, the jury concluded that this justification was a sham or pretext for granting a single cable television franchise and that defendants used this justification to promote the making of cash payments and the provision of in kind services by the company ultimately selected as the franchisee. They also concluded that this justification was used to obtain increased campaign contributions for local elected officials.

On the other hand, the jury agreed with defendants that the public as a whole benefits from equal and uniform cable television service throughout the Sacramento community and that defendants' franchising process encourages such uniformity to a greater degree than would be achieved in its absence. The jury also found that the public obtains significant benefits from the provision of public access channels, production facilities, technical assistance and grant programs. According to the jury, defendants' franchising process promotes the provision of these kinds of resources to a greater extent than would be provided in the absence of the process, although it also concluded that defendants were motivated to provide such benefits by a desire to obtain increased political influence and to favor local officials' political supporters.

The jury was also persuaded that the public has a significant interest in both the financial and technical qualifications or background of any company constructing or operating a cable television system in Sacramento. The jury determined that defendants' franchising process promoted the public's interest in having financially sound cable television operators but did not promote the interest in having technically sound operators. According to the jury,

defendants did not use such interest as pretexts to justify the franchising process.

Finally the jury said that defendants' franchising process does *not* result in "better" cable television service (in terms of the system's technology, capabilities and channel capacity) than would be achieved without the franchising process. The jury was unable to agree on whether defendants used "better cable television service" as a pretext to justify their franchising process.

The jury was also unable to agree on whether the predominant purpose of defendants' franchising process was to suppress speech. They disagreed on whether the predominant purpose was to limit the ability of cable operators to express their views and exercise their editorial judgment. The jury was also divided on whether defendants denied plaintiff permission to construct and operate a cable television system because defendants oppose plaintiff's views. Also unanswered are the special verdicts on whether the franchising process applies evenhandedly, regardless of viewpoint, and whether defendants' purpose was to advance the expression of one viewpoint and discourage the expression of another.

### C. *The Court's Task*

■ Once the special verdicts are recorded, the court then applies the law to the facts and enters judgment as provided in Federal Rule of Civil Procedure 58. *Quaker City,* 747 F.2d at 1453. Entry of judgment upon a jury's special verdict is subject not only to precedential guidelines but to constitutional constraints as well. *Griffin v. Matherne,* 471 F.2d 911, 915 (5th Cir.), *reh'g denied,* 474 F.2d 1347 (1973). The seventh amendment requires that if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly. *Id.; see also Ladnier v. Murray,*

769 F.2d 195, 198 (4th Cir.1985) (court has duty to harmonize answers if fairly possible). Finally, a special verdict must, of course, be construed in light of surrounding circumstances. *R.H. Baker,* 331 F.2d at 509.

### III. FINDINGS AND CONCLUSIONS BY THE COURT

#### A. *Mootness as a Result of Change in Cable Policy*

The threshold question the court must address concerns an issue which arose after the jury returned its special verdicts. Defendants enacted ordinances which opened up the cable market to competition. These ordinances impose certain requirements[5] on would-be cable operators but otherwise abandon the single franchise policy. Defendants observe that plaintiff is only challenging defendants' determination that there should be a single provider of cable television services in Sacramento. Because this is no longer defendants' policy, defendants argue that plaintiff's request for injunctive and declaratory relief is moot.

■ A case, or a question in a case, is considered moot if it has lost its character as a present, live controversy. *Aguirre v. S.S. Sohio Intrepid,* 801 F.2d 1185, 1189 (9th Cir.1986). The basic question is whether there is a sufficient prospect that the decision will have an impact on the parties, *Williams v. I.N.S.,* 795 F.2d 738, 741 (9th Cir.1986) (quoting 13A C. Wright, A. Miller and E. Cooper, Federal Practice and Procedure § 3533 at 212 (2d ed. 1984)), inasmuch as federal courts are without power to decide questions that cannot affect the rights of litigants. *Aguirre,* 801 F.2d at 1189 (citing *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971)). When events subsequent to the filing of a complaint moot

---

**5.** Under the new ordinances, the applications for a cable license require (1) the applicant's identity, (2) compliance with all zoning, building and encroachment ordinances, (3) a map of the license area, (4) a small application fee, (5) a performance bond, and (6) the applicant's schedule of construction. Licenses shall be is-

sued unless the application is deficient or the applicant is in default of a previously issued license. In addition, the ordinance provides for payment of five percent of gross revenues as license fees, limited public access requirements and enforcement mechanisms.

issues in a case, no justiciable controversy is presented. *Id.* (citing *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968)).

In *Armster v. United States District Court,* 806 F.2d 1347 (9th Cir.1986), the Ninth Circuit indicated that the ultimate question is the likelihood of recurrence of the challenged activity. *Id.* at 1358. When there is a reasonable possibility that the unlawful conduct will recur, the mere cessation of that conduct will not render the challenged conduct immune from judicial scrutiny. *Id.* at 1358–59. There is a "powerful presumption favoring adjudication" under such circumstances. *Id.* at 1359 (quoting Fallon, *Of Justiciability, Remedies, and Public Law Litigation: Notes on the Jurisprudence of Lyons,* 59 N.Y.U. L.Rev. 1, 27 (1984)).

The court does not question defendants' good faith in adopting these new ordinances. However, the new ordinances are presently under attack; the existing franchisee recently filed suit in state court against, *inter alia,* the defendants in this suit. The state court suit alleges that the new ordinances are unconstitutionally vague and violate the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521 *et seq.* The complaint also alleges that the new ordinances conflict with provisions of the old cable television ordinance (which was not repealed) and various contractual obligations of defendants. There is also a due process claim. The complaint seeks declaratory and injunctive relief, as well as damages. It specifically seeks an injunction against the issuance of licenses under the new ordinances.

On July 2, 1987, the complaint was removed to this court and has been assigned to the undersigned.[6] Plaintiff has since notified the court of its intent to seek a preliminary injunction which would enjoin defendants from issuing any licenses under the new ordinances.

■ This court cannot, at this early stage, express any views on the merits of these attacks on the new ordinances. The attacks nonetheless create the possibility that any licenses issued under the ordinances will ultimately be invalidated. If this occurs, plaintiff in the instant case will not receive the relief it sought in initiating this lawsuit: the right to enter the Sacramento cable television market.

In short, this court can only resolve one lawsuit at a time. The law on cable television franchising/licensing is too uncertain for this court to even begin to predict the outcome of this second suit. Consequently, it must *assume* that the second lawsuit creates a reasonable possibility that permanent licenses will not be issued under the new ordinances or, if they are, they may be subsequently declared invalid. Because of this, the court's decision vis-a-vis injunctive relief in the instant case will have an impact on the parties and will affect plaintiff's rights. Therefore, plaintiff's request for injunctive and declaratory relief is not moot.[7]

### B. *Plaintiff's First Amendment Rights*

Plaintiff claims, in essence, that defendants' refusal to give plaintiff permission to construct and operate a cable television system in the Sacramento metropolitan area infringes on plaintiff's free speech rights under the United States and California Constitutions.[8] Plaintiff emphasizes that it is challenging only that aspect of defendants' franchising process which resulted in the selection of a single cable television franchisee and the consequent exclusion of plaintiff from the cable market. Plaintiff is not asking the court to decide what requirements generally may or

---

6. See order relating cases dated August 3, 1987.

7. Of course, a final determination as to the validity of the new ordinances may moot this controversy at some point in the future. The court's holding is simply that, at this point, plaintiff's request for injunctive and declaratory relief is justiciable.

8. Nearly all of the briefing in this case—particularly the post-trial briefing—has focused on plaintiff's federal constitutional rights. Because the court finds the federal constitutional claim dispositive, it does not reach the state constitutional claim.

may not be imposed on one engaging in the cable television business.

### 1. Plaintiff's Speech is Protected by the First Amendment

■ As a threshold matter, the court notes that both the Supreme Court and Ninth Circuit have determined that cable television system operators are entitled to some degree of first amendment protection. *Preferred,* 754 F.2d at 1403 (it is clear "some" first amendment protection exists), *aff'd on narrower grounds,* 106 S.Ct. at 2037 (proposed activities "seem to implicate" first amendment interests); *see also Pacific West,* 798 F.2d at 355 ("Pacific West's proposed cable broadcasting activities undoubtedly implicate first amendment interests ...").

The jury found in this case that plaintiff has the technical and financial capabilities to construct and operate a cable television system, and hence is a first amendment speaker. As such, plaintiff's exclusion from the cable television market creates a first amendment issue.

### 2. Standard to be Applied

Of course, to say that defendants' franchising process presents a first amendment *issue* is not to say that it constitutes a first amendment *violation. See Vincent,* 466 U.S. at 803–05, 104 S.Ct. at 2127–28 (quoting *Metromedia, Inc. v. San Diego,* 453 U.S. 490, 561, 101 S.Ct. 2882, 2920, 69 L.Ed.2d 800 (1981) (Burger, C.J., dissenting)). The mere fact that a regulation imposes a limitation on constitutionally protected speech does not mean the regulation is invalid; the question is whether the regulation represents a constitutionally permissible restriction on speech. *See Consolidated Edison Co. of New York, Inc. v. Public Service Commission of New York,* 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980).

■ Defendants argue that this determination cannot be made at this point because the jury was unable to agree on any of the special verdicts dealing with "content-neutrality" of defendants' policy. Regulations adopted with a purpose to suppress first amendment rights are presumptively invalid; however, this presumption only applies if suppression of speech is a predominant purpose in enacting the regulation. *Walnut Properties, Inc. v. City of Whittier,* 808 F.2d 1331, 1334–35 (9th Cir. 1986) (citing *City of Renton v. Playtime Theatres,* 475 U.S. 41, 45–49, 106 S.Ct. 925, 928–29, 89 L.Ed.2d 29, *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986)). "Content-based" suppression of speech is impermissible because government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. *Renton,* 106 S.Ct. at 929 (quoting *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)).

Defendants contend that the jury's inability to agree on defendants' purposes in using their franchising process means that the only appropriate course of action at this point is to schedule further trial limited to the issue of contentneutrality, citing *Iacurci v. Lummus Co.,* 387 U.S. 86, 87, 87 S.Ct. 1423, 1424, 18 L.Ed.2d 581 (1967) (per curiam), and 5A Moore's Federal Practice ¶ 49.03[4] at 49–29. These authorities stand for the proposition that a jury's failure to determine an issue actually submitted to it requires a new trial on the issue, because the right to a jury trial thereon has not been waived.

■ The court agrees that it would be improper for the court to make an affirmative finding on whether defendants' policy does indeed discriminate against speech and speakers based on viewpoint.[9] However, a new trial is only necessary if the jury's determination on that issue would make a difference to the court's judgment. *See Union Pacific Railroad Co. v. Bridal Veil Lumber Co.,* 219 F.2d 825, 831–32 (9th

---

**9.** The court notes that plaintiff does indeed ask for such a finding in its post-trial brief and asks this court to subject defendants' policy to strict scrutiny. *See Consolidated Edison,* 447 U.S. at 540, 100 S.Ct. at 2334 (regulation must be a precisely drawn means of serving a compelling governmental interest).

Cir.1955) (jury's disagreement on "vital question" left "a gaping hole" in special verdict requiring a new trial), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 849 (1956). Even if the jury found in defendants' favor during the new trial, the court would find that defendants' policy does not survive the lesser scrutiny applied to viewpoint-neutral regulations. Because of this, no new trial is necessary.

Accordingly, the court will assume, for the purposes of analysis, that defendants' policy is viewpoint-neutral.[10] The appropriate framework for reviewing a viewpoint-neutral regulation is set forth in *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Under *O'Brien,*

> [a] government regulation is sufficiently justified if it is within the constitutional power of government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged first amendment freedoms is no greater than is essential to the furtherance of that interest.

391 U.S. at 377, 88 S.Ct. at 1679; *see also Preferred,* 754 F.2d at 1405–06; 106 S.Ct. at 2037–38 (also referring to *O'Brien* test).

A regulation is "no greater than essential" under *O'Brien* if it promotes a substantial government interest which would be achieved less effectively absent the regulation. *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed. 2d 536 (1985). Regulations are not invalid simply because there is some imaginable alternative that might be less burdensome on speech, *id.;* some "substantially relevant correlation" between the interests asserted and the single franchise policy must

exist. *See Pacific Gas and Electric v. Public Utilities Commission of California,* 475 U.S. 1, 19, 106 S.Ct. 903, 913, 89 L.Ed.2d 1 (discussing the definition of a "narrowly tailored" means), *reh'g denied,* 475 U.S. 1133, 106 S.Ct. 1667, 90 L.Ed.2d 208 (1986); *see also Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298 n. 8, 104 S.Ct. 3065, 3071–72 n. 8, 82 L.Ed.2d 221 (1984) (*O'Brien* requires an "adequate nexus between regulation and interest sought to be served"); *Preferred,* 754 F.2d at 1406 (requiring a "more sharply focused response").

The court notes in passing that defendants' policy cannot be justified as a content-neutral "time, place and manner" regulation. Time, place and manner restrictions are acceptable so long as they are designed to serve a substantial government interest and do not unreasonably limit alternative avenues of communication. *City of Renton,* 106 S.Ct. at 928 (citing *Clark,* 468 U.S. at 293, 104 S.Ct. at 3069, *Vincent,* 466 U.S. at 807, 104 S.Ct. at 2130, and *Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981)). In this case, the jury found that defendants had not left open ample alternative channels of communication for plaintiff, and persons like plaintiff, who wish to express their views. *See also Preferred,* 754 F.2d at 1410 (public access channels not an adequate substitute for right to operate a cable system). Defendants' single franchise policy results in plaintiff's cable television speech being restricted, in essence, to "no time, no place and no manner." *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 75–77, 101 S.Ct. 2176, 2186–87, 68 L.Ed.2d 671 (1981).[11]

---

**10.** The district court in *Century Federal, Inc. v. City of Palo Alto, California,* 648 F.Supp. 1465 (N.D.Cal.1986), also assumed, for the purposes of a summary judgment motion, that the franchising process was content-neutral. *Id.* at 1475 n. 16. It therefore applied the *O'Brien* test. *Id.* at 1475; *but see Preferred,* 754 F.2d at 1406 (single franchise policy creates a serious risk that public officials will discriminate on the basis of the content of, and views expressed in, the company's programs).

**11.** An example of a reasonable time, place and manner regulation of cable television might involve restricting the intervals at which cable television systems are installed, e.g., allowing access to utility underground conduits every few years. This might constitute the "sharply focused response," *see Preferred,* 754 F.2d at 1406, to defendants' asserted interest in controlling the number of times its citizens must bear the inconvenience of having their streets and yards dug up. *See Community Communications Co. v. City of Boulder,* 660 F.2d 1370, 1377 (10th

### 3. Analysis

#### a. Constitutional Power of Government to Regulate Cable Television

■■ The authority of local government to authorize the construction and operation of cable systems within its jurisdiction is recognized under both state and federal law. Section 53066 of the California Government Code provides, in pertinent part:

Any city or county or city and county in the State of California may, pursuant to such provisions as may be prescribed by its governing body, authorize by franchise or license the construction of a community antenna television system. In connection therewith, the governing body may prescribe such rules and regulations as it deems advisable to protect the individual subscribers to the services of such community antenna television system. The award of the franchise or license may be made on the basis of quality of service, rates to the subscriber, income to the city, county or city and county, experience and financial responsibility of the applicant plus any other consideration that will safeguard the local public interest, rather than a cash auction bid.... Any cable television franchise or license awarded by a city or county or city and county pursuant to this section may authorize the grantee thereof to place wires, conduits and appurtenances for the community antenna television system along or across such public streets, highways, alleys, public properties, or public easements of said city or county or city and county. Public easements, as used in this section, shall include but shall not be limited to any easement created by dedication to the city or county or city and county for public utility purposes or any other purpose whatsoever.

The court disagrees with plaintiff's contention that section 767.5 of the California Public Utilities Code supersedes this provision in the Government Code and somehow "preempts" local regulation of cable television. Section 767.5(b) provides:

The Legislature finds and declares that public utilities have dedicated a portion of such support structures to cable television corporations for pole attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations.

The Legislature further finds and declares that it is in the interest of the people of California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations.

The court interprets this section as imposing upon public utilities a mandatory duty to make "surplus space" on utility poles and in utility easements available for use by cable television operators. The section in no way addresses or diminishes the authority of local governments to regulate access to that space.

The Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.*, and the legislative history accompanying it, also recognizes the authority of local governments to authorize construction of cable systems over public rights of way and utility easements. *See* 47 U.S.C. § 541(a) (a franchising authority may award one or more franchises; franchises authorize construction of cable systems over public rights of way and utility easements). Although the 1984 Act was not in effect at the time defendants enacted the cable television ordinance, the franchising provisions of the Act were declarative of existing law and practice.

Cir.1981), *cert. dismissed,* 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 127–28 (7th Cir.1982); *Berkshire Cablevision of Rhode Island v. Burke,* 571 F.Supp.

976, 984 (D.R.I.1983), *vacated as moot,* 773 F.2d 382 (1st Cir.1985). The court notes, however, that the jury rejected all of the justifications for defendants' policy based on the disruptiveness of installing cable television systems.

*See* H.R.Rep. No. 934, 98th Cong. 2d Sess., 1984, 19, *reprinted in* 1984 U.S.Code Cong. & Ad.News 4655, 4656 (the act "continues reliance on the local franchising process as the primary means of cable television regulation . . ."); S.Rep. No. 67, 98th Cong., 1st Sess., 11 ("the bill restores the jurisdictional framework for cable to its traditional and appropriate balance. That balance continues to give local governments the authority over areas of local concern and authorizes them to protect local needs.")

■ Consequently, franchising of cable television systems is within defendants' constitutional power. *Accord, Century Federal,* 648 F.Supp. at 1475 n. 17; *see also Preferred,* 754 F.2d at 1400 (cable franchising is authorized by Cal.Gov't.Code § 53066; 1984 Cable Act envisions similar practice).

b. Magnitude of Interests Which Must Be Served

The question is whether the interests identified by the jury are *sufficiently* substantial to justify the resulting impact on expression. *Vincent,* 466 U.S. at 805, 104 S.Ct. at 2129. At issue in this case is the permissibility of a government created monopoly of a particular medium of communication. Generally speaking, such monopolies are antithetical to the principles underlying the first amendment. *See e.g., Red Lion Broadcasting v. F.C.C.,* 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969) (purpose of first amendment is "to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail"); *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 1425, 89 L.Ed.2d 2013 (first amendment rests on assumption that widest possible dissemination of information from diverse and antagonistic sources is essential to public welfare), *reh'g denied,* 326 U.S. 802, 66 S.Ct. 6, 90 L.Ed. 489 (1945).

The jury's finding that cable television is not a natural monopoly is particularly important in this analysis. In a naturally monopolistic industry

the benefits, and indeed the very possibility, of competition are limited. You can

start with a competitive free-for-all—different cable television systems frantically building out their grids and signing up subscribers in an effort to bring down their average costs faster than their rivals—but eventually there will be only a single company, because until a company serves the whole market it will have an incentive to keep expanding in order to lower its average costs. In the interim there may be wasteful duplication of facilities. This duplication may lead not only to higher prices to cable television subscribers, at least in the short run, but also to higher costs to other users of the public ways, who must compete with the cable television companies for access to them.

*Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d at 126. The Eighth Circuit described the phenomenon this way:

[a] monopoly resulting from economics of scale, a relationship between the size of the market and the size of the most efficient firm such that one firm of efficient size can produce all or more than the market can take at a remunerative price, and can continually expand its capacity at less cost than that of a new firm entering the business. In this situation, competition may exist for a time but only until bankruptcy or merger leaves the field to one firm, in a meaningful sense, competition is self-destructive.

To put this definition in short-hand form, a natural monopoly is a market that can practically accommodate only one competitor.

*National Reporting Co. v. Alderson Reporting Co.,* 763 F.2d 1020, 1023–24 (8th Cir.1985) (quoting *Ovitron Corp. v. General Motors Corp.,* 295 F.Supp. 373, 377 n. 3 (S.D.N.Y.1969)).

Government regulates natural monopolies to provide at least a partial substitute for the discipline provided by competition. As Judge Posner observed in *Omega:*

An alternative procedure is to pick the most efficient competitor at the outset, give him a monopoly, and extract from him the commitment to provide reason-

able service at reasonable rates ... [This] may be the inevitable destination to which all routes converge.

694 F.2d at 126;[12] *see also Affiliated Capital Corp. v. City of Houston,* 700 F.2d 226, 234 (5th Cir.) ("If there is to be no competition within a given territory, competition is only possible before the franchise is granted."), *vacated on other grounds,* 714 F.2d 25 (1983), *and adhered to,* 735 F.2d 1555 (5th Cir.1984) (en banc).

If the jury had determined that cable television in the Sacramento area was indeed a natural monopoly and that competition would have "inevitably" resulted in a single firm controlling the market, then the impact of a single franchise policy on first amendment freedoms would have been much less.[13] If, because of the cost structure of a cable television system, a monopoly is inevitable, it does not significantly reduce the overall diversity of expression if government accelerates the process by designating the monopolist at the outset, particularly if the cable operator agrees to provide public access channels and facilities and provided that the selection criteria are content-neutral. *But see Preferred,* 754 F.2d at 1406 (single franchise policy creates serious risk of content discrimination).

 However, if competition is feasible and sustainable, then the impact of selecting a single cable television service provider and then excluding all others has an extremely significant effect on expression. As a result, the magnitude of the government interests necessary to justify such an impact on expression must be very substantial. Unfortunately the interests identified by the jury are not sufficiently substantial to justify a government-endorsed monopoly over a particular medium of communication, nor is such a monopoly "essential" to the furtherance of these interests.

### c. Government's Interest in Financial and Technical Qualifications of Cable Operators

The government's interest in the technical and financial qualifications of cable television system operators is reflected in various sections of the 1984 Cable Act. *See* 47 U.S.C. § 544 (regulation of services, facilities and equipment), § 552 (consumer protection); it is also reflected in the Act's legislative history:

> This grant of authority to a franchising authority to award a franchise establishes the basis for state and local regulation of cable systems. Other sections of the bill establish certain terms by which such authority may be exercised. In addition, matters subject to state and local authority include, to the extent not addressed in the legislation, certain terms and conditions related to the grant of a franchise (*e.g.,* duration of the franchise term, delineation of the service area), the construction and operation of the system (*e.g.,* extension of service, safety standards, timetable for construction) and the enforcement and administration of a franchise (*e.g.,* reporting requirements, bonds, letters of credit, insurance and indemnification, condemnation, and transfers of ownership).

H.R.Rep. No. 934, 98th Cong. 2d Sess. 59, *reprinted in,* 1984 U.S.Code Cong. & Admin.News 4655, 4696. The Ninth Circuit has also suggested that local government has a legitimate interest in the "size, shape, quality, [and] qualifications" of cable television operators. *Pacific West,* 798 F.2d at 355.

In this case, however, even though the jury found that the public has a significant interest in the technical and financial quali-

---

**12.** Any claims that defendants' single franchise policy resulted in a "more efficient" cable system than under a competitive system is belied by the jury's finding that defendants' policy did *not* result in "better" cable television service (in terms of the system's technology, capabilities and channel capacity) than would have been achieved without defendants' actions.

**13.** The court emphasizes that it is not expressing an opinion as to whether a single franchise policy would be permissible if the jury *had* found that cable television is a natural monopoly. *See Century Federal,* 648 F.Supp. at 1474–77 (rejecting "natural monopoly" as a justification for a single franchising scheme). All this court is saying is that the *impact* of such a policy on first amendment interests is much greater when cable television is not a natural monopoly.

fications of cable television system operators, it also found that defendants' policy did not promote their interest in having a technically well-qualified cable television system operator. Furthermore, the jury also found that plaintiff has the technical and financial capabilities to construct and operate a cable television system, which suggests that defendants' single franchise policy goes further than necessary in excluding would-be cable television system operators from the market. In fact, there was no showing or argument that a single franchise policy is the only, or even the most effective, way to assure that only technically and financially sound cable television systems are built.[14] Thus while these constitute significant government interests, the restriction on speech caused by defendants' policy is significantly greater than necessary to promote these interests.

### d. Government's Interest in Uniform Cable Service

The substantiality of the government's interest in assuring uniform cable television service is also reflected in the fact that the 1984 Cable Act mandates such service. Section 621(a)(3) of the Act provides:

> In awarding a franchise or franchises, a franchising authority shall assure that access to cable services is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides.

47 U.S.C. § 541(a)(3). In adopting this provision, Congress explained:

> Subsection (a)(3) provides that in awarding the franchise, the financing authority shall assure that no class of potential residential cable subscribers is denied cable service due to income or economic status. In other words, cable systems will not be permitted to "redline"

(the practice of denying service to lower income areas). Under this provision, a franchising authority in the franchise process shall require the wiring of all areas of the franchise area to avoid this type of practice. However, this would not prohibit a franchising authority from issuing different franchises for different geographic areas within its jurisdiction.

House Report, at 59, 1984 U.S.Code Cong. & Admin.News at 4696.

However, Congress' intentions vis-a-vis uniform service has been the subject of controversy. Initially, the Federal Communications Commission ("F.C.C.") interpreted this section as meaning that "the franchising authority shall require that *all* areas of the franchised area be wired." Notice of Proposed Rulemaking, 49 Fed.Reg. at 48,769 (emphasis added). It subsequently retreated from this position:

> [T]he intent of [section 621(a)(3) ] was to prevent the exclusion of cable service based on income and that this section does not mandate that the franchising authority require the complete wiring of the franchise area in those circumstances where such an exclusion is not based on the income status of the residents of the unwired area.

Report and Order, 50 Fed.Reg. at 18,647. The District of Columbia Circuit recently upheld F.C.C.'s most recent interpretation, reasoning that

> [t]he statute on its face prohibits discrimination on the basis of income; it manifestly does not require universal service. The agency ruling explicitly reaffirms the prohibition against redlining emphasized by the House report. The ACLU argues that the committee report evidences congressional intent that as a practical matter one can only deal with redlining by wiring "all areas of the franchise." Otherwise "an endless variety of 'facially neutral' excuses [could] be used

---

**14.** The court notes that defendants' new licensing ordinances set minimum technical and financial standards for cable television operators. Sacramento County, Cal., Code ch. 5.75 (hereinafter cited as "County Ordinance"), sub-chapter 3 (System Capability and Standards), sub-chapter 4 (Construction Requirements) and sub-

chapter 7 (Bonds and Insurance) (July 6, 1987); Sacramento City, Cal., Code ch. 20.5 (hereinafter cited as "City Ordinance"), sub-chapter 3 (System Capability and Standards), sub-chapter 4 (Construction Requirements) and sub-chapter 7 (Bonds and Insurance).

by cable operators to deny cable service to 'unprofitable' parts of a community." Brief for ACLU at 25. We hold that this one sentence from the committee report cannot reasonably be read to so drastically limit the agency's interpretation of the scope of its discretion in accomplishing the legislative goal. *See, e.g., FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598 [101 S.Ct. 1266, 1276, 67 L.Ed.2d 521] (1981) ("The legislative history of the Act ... provides insufficient basis for invalidating the agency's construction of the Act."); *cf. supra* II.A.1 at 36–39. Rather, we read the sentence to require exactly what it says: "wiring of all areas of the franchise" *to prevent redlining*. However, if no redlining is in evidence, it ·is likewise clear that wiring within the franchise area can be limited. This is precisely the statement made in the interpretative ruling. It wholly conforms to the statute and the explication in the House report. We therefore uphold the comment as fully consistent with clear congressional intent.

*ACLU v. F.C.C.*, 823 F.2d 1554 (D.C.Cir. 1987).

Of course, defendants are free to go further than Congress requires, and again, defendants adopted the policy challenged in this suit prior to the effective date of the 1984 Cable Act. In fact, of all of the interests identified by the jury, the court believes that defendants' interests in assuring uniform service and preventing redlining is the most substantial, inasmuch as it promotes the "widest possible dissemination of information." *See Associated Press*, 326 U.S. at 20, 65 S.Ct. at 1425.[15] Yet as important as the government's interest is in equal and uniform service, it is not sufficiently substantial to justify a government-created, artificial monopoly over a particular medium of communication, particularly when it is not clear that such a monopoly is essential to achieving such uniform service.

e. Government's Interest in Public Access Channels, Etc.

Public access to cablecasting is another interest which Congress saw fit to cover in the 1984 Cable Act, although the Act's provisions are permissive only. 47 U.S.C. § 531.[16] Of all the interests identified by

---

**15.** The court acknowledges, however, that such a requirement may be challenged as representing "forced speech." *See Pacific Gas and Electric*, 106 S.Ct. at 909 (first amendment protections include right not to speak).

**16.** The Act's access provisions read:
Section 531. Cable channels for public, educational, or governmental use.
(a) Authority to establish requirements with respect to designation or use of channel capacity
 A franchising authority may establish requirements in a franchise with respect to the designation or use of channel capacity for public, educational, or governmental use only to the extent provided in this section.
(b) Authority to require designation for public, educational, or governmental use
 A franchising authority may in its request for proposals require as part of a franchise, and may require as part of a cable operator's proposal for a franchise renewal, subject to section 546 of this title, that channel capacity be designated for public, educational, or governmental use, and channel capacity on institutional networks be designated for educational or governmental use, and may require rules and procedures for the use of the channel capacity designated pursuant to this section.

(c) Enforcement authority
 A franchising authority may enforce any requirement in any franchise regarding the providing or use of such channel capacity. Such enforcement authority includes the authority to enforce any provisions of the franchise for services, facilities, or equipment proposed by the cable operator which relate to public, educational, or governmental use of channel capacity, whether or not required by the franchising authority pursuant to subsection (b) of this section.
(d) Promulgation of rules and procedures
 In the case of any franchise under which channel capacity is designated under subsection (b) of this section, the franchising authority shall prescribe—
 (1) rules and procedures under which the cable operator is permitted to use such channel capacity for the provision of other services if such channel capacity is not being used for the purposes designated, and
 (2) rules and procedures under which such permitted use shall cease.
(e) Editorial control by cable operator
 Subject to section 544(d) of this title, a cable operator shall not exercise any editorial control over any public, educational, or governmental use of channel capacity provided pursuant to this section....

the jury, public access is the most controversial.

For example, public access requirements may have their own constitutional infirmities. The Supreme Court has explicitly refused to rule on the first amendment permissibility of public access requirements, except to note that the claims of unconstitutionality are not frivolous. *See Midwest Video Corp. v. F.C.C.*, 440 U.S. 689, 709 n. 19, 99 S.Ct. 1435, 1446 n. 19, 59 L.Ed.2d 692 (1979). Congress was careful to note this when it included a public, educational and governmental (PEG) access provision in the 1984 Cable Act:

> H.R. 4103 includes several provisions, specifically those related to PEG and commercial access, which may require that certain channels or portions of channels on a cable system be available for programming and controlled by a person other than the cable operator. The committee is aware that access provisions have been challenged in the court as inconsistent with the First Amendment rights of the cable operator. The Committee believes, nonetheless that the access provisions contained in this legislation are consistent with and further the goals of the First Amendment. The provision [sic] establish a form of content-neutral structural regulation which will foster the availability of a "diversity of viewpoints" to the listening audience. In the past, courts have held a similar regulation to be consistent with the First Amendment.

H.R.Rep. No. 98–934, 98th Cong.2d Sess. at 31, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4668. Two district courts have held that access requirements are constitutional. *Erie Telecommunications, Inc. v. City of Erie*, 659 F.Supp. 580, 598–601 (W.D.Pa.1987); *Berkshire Cablevision*, 571 F.Supp. at 987; *but see Midwest Video Corp. v. F.C.C.*, 571 F.2d 1025, 1053–57 (8th Cir.1978), *aff'd on other grounds*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979). In each of the cases in which the access requirement was found constitutional, the court nonetheless acknowledged that access infringed upon the rights of the

franchisee. *Erie*, 659 F.2d at 599; *Berkshire*, 571 F.Supp. at 987.

Moreover, some of the jury's verdicts in this case indicate that defendants' interests were not "unrelated to the suppression of expression," as required under the *O'Brien* test. The jury found that defendants were motivated to secure public access channels and in kind services by a desire to obtain political support and favor political supporters. The jury also found that defendants used cable television's allegedly naturally monopolistic nature as a pretext to obtain cash payments, in kind services and increased campaign contributions. This suggests that defendants sought to enhance the speech of some while burdening the expression of others—a result which is contrary to the first amendment values. *See Pacific Gas and Electric*, 106 S.Ct. at 914 (citing *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707, *reh'g denied*, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978), and *Buckley v. Valeo*, 424 U.S. 1, 48–49, 96 S.Ct. 612, 648–49, 46 L.Ed.2d 659 (1976)).

While these motivations do not rise to the level of a "predominant purpose" to suppress speech, *see Walnut Properties*, 808 F.2d at 1334–35, they nonetheless affect the analysis of whether the defendants' interest in providing public access is sufficiently substantial to justify the impact on expression caused by a single franchise policy. As with the potential constitutional questions surrounding public access, the fact that defendants may have had less than noble motivations in promoting public access diminishes the substantiality of the government's interest in such access and increases the resulting impact on expression.

Finally, even if public access requirements are constitutional, the court is again not persuaded that a single franchise policy is the only effective way to secure such access. The court recognizes that the prospect of a monopoly is more likely to motivate a cable television system operator to accept public access requirements. *See Century Federal*, 648 F.Supp. at 1476 (of-

fer of exclusive franchise can be used as a "plum" to bargain for certain concessions, *e.g.*, access channels, which may not be obtainable under a competitive system). However, there was no showing that such channels would be uneconomic in a competitive system, particularly if access requirements are uniformly imposed on all cable television system operators.[17]

### 4. Conclusion

To summarize, defendants bear the burden of proving that the elements of the *O'Brien* test are satisfied. 754 F.2d at 1406, n. 9. The jury's determination that cable television is not a natural monopoly means that the impact of a government-created, "artificial" monopoly over cable television on free expression is tremendous; it means that in the absence of defendants' single franchise policy, competition among cable television systems is feasible. If this is true, then a single franchise policy significantly reduces the diversity of expression available to cable television subscribers.

Under *O'Brien*, the interests served by a single franchising system must be commensurately substantial. Although the interests identified by the jury are important, they are not sufficiently important to justify the exclusion of all but one speaker from a particular medium—especially a medium as increasingly important as cable television. Furthermore, the nature of the interests are such that they can be promoted through means which are less restrictive of first amendment rights. Because of this, the court concludes that plaintiff is entitled to judgment in its favor on its first amendment claim.

### C. *Relief Sought by Plaintiff*

By reason of the alleged constitutional deprivations, plaintiff requests: (1) a declaratory judgment establishing plaintiff's right to construct, install and operate a cable television system within Sacramento County; (2) a permanent injunction enjoin-

ing defendants from interfering with the rights established in favor of plaintiff under the requested declaratory relief judgment; (3) special and general damages occasioned by defendants' alleged wrongful acts; (4) attorneys' fees and costs pursuant to statute.

■ Inasmuch as this case is not moot, a declaratory judgment establishing that defendants' single franchising policy violates plaintiff's first amendment rights is appropriate. With respect to its request for injunctive relief, plaintiff indicated at the post-trial hearing that it is seeking two kinds of relief:

1. An order directing defendants to "open up" the utility trenches to which plaintiff has been denied access as a result of defendants' refusal to issue it a franchise in 1983 and/or their refusal to allow plaintiff to lay its conduit while this action was pending; and

2. An order directing defendants to grant plaintiff permission to construct and operate a cable television system.

To issue a permanent injunction, the court must find that the movant has no adequate remedy at law and will suffer irreparable harm if the court denies relief. *Burrus v. Turnbo*, 743 F.2d 693, 699 (9th Cir.1984), *cert. denied*, 474 U.S. 816, 106 S.Ct. 59, 88 L.Ed.2d 48, *vacated as moot*, 474 U.S. 1016, 106 S.Ct. 562, 88 L.Ed.2d 548 (1985). If damages can compensate a plaintiff, a permanent injunction will not lie. *Holly Sugar Corp. v. Goshen County Cooperative Beet Growers Ass'n*, 725 F.2d 564, 569–70 (10th Cir.1984).

■ The court finds that money damages could have compensated plaintiff for the extra expense it will incur as a result of having been denied access to utility trenches during the pendency of this suit (assuming such access would have been available even if plaintiff had received permission to build its cable television system).

---

**17.** Indeed, the new licensing ordinances have such access requirements. *See* County Ordinance, at §§ 5.75.212, 5.75.214 and 5.75.216; City Ordinance, at §§ 20.5.212, 20.5.214 and 20.5.216.

Irrespective of whether plaintiff did or did not present its claims in this respect to the jury, injunctive relief is not appropriate.

■■■ However, the court finds that injunctive relief is appropriate with respect to plaintiff's request for permission to build and operate its cable television system. The nature of the relief sought is such that plaintiff has no adequate remedy at law and will suffer irreparable harm if equitable relief is denied.

As already indicated, the issue of damages was submitted to the jury. It found that no damages should be awarded. The court notes that plaintiff objected to defendants' proposed instruction on nominal damages, *see Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1053–54, 55 L.Ed.2d 252 (1978) (denial of constitutional right actionable for nominal damages not to exceed one dollar); as a result, no such instruction was given. The court also determined that this was an inappropriate case for so-called "presumed" damages, inasmuch as plaintiff was actually seeking compensatory damages. *See Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 2545–46, 91 L.Ed.2d 249 (1986) (presumed damages a *substitute* for ordinary compensatory damages, not a *supplement* for such damages); *but see City of Watseka v. Illinois Public Action Council*, 796 F.2d 1547, 1558–59 (7th Cir.1986), *aff'd mem.,* —— U.S. ——, 107 S.Ct. 919, 93 L.Ed.2d 972, *reh'g denied,* —— U.S. —— 107 S.Ct. 1389, 94 L.Ed.2d 703 (1987).

Finally, with respect to plaintiff's request for fees and costs, such a request may be made after entry of judgment in accordance with the procedures established in Local Rules 292 and 293 for the Eastern District of California.

## IV. ORDER FOR ENTRY OF JUDGMENT

In light of the special verdicts returned by the jury and the determinations and conclusions of law set forth above, the Clerk is directed to enter judgment herein in the following form and content:

## JUDGMENT

Pursuant to the special verdicts of the jury and the determinations and conclusions of law signed and filed by the court on August ———, 1987 (entitled "Memorandum Decision, Conclusions of Law and Order for Judgment"), and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. That the formulation and implementation of defendants' cable television franchising process, to the extent to which the issuance of a franchise or license to construct and operate a cable television system in the Sacramento area is restricted to a single successful applicant, constitutes a denial of plaintiff's free speech rights guaranteed by the first amendment to the United States Constitution through the fourteenth amendment;

2. That by reason of the determination in paragraph 1 above, defendants (including their respective officers, agents, servants, employees, attorneys, or any of them) and all persons acting in concert or participation with defendants, or with any of the foregoing, are permanently enjoined and directed to issue to plaintiff, within thirty (30) days herefrom, a license or licenses, to the extent provided for in chapter 5.75 of the Sacramento County Code and chapter 20.5 of the Sacramento City Code, for the construction and operation of a cable television system or systems within the defendants' jurisdictions.

Subject to the provisions hereinafter set forth, a license or licenses issued pursuant to this injunction shall be deemed to be subject to said chapters 5.75 and 20.5, respectively, of the County and City codes; provided, however, that

 a. Plaintiff shall be deemed to have reserved to itself the right to challenge, in an appropriate judicial forum, the validity and/or constitutionality of each or any term or condition in the specified code chapters, although plaintiff shall abide by and comply with any such challenged terms and conditions

pending (1) a final determination as to its validity or invalidity by a court of competent jurisdiction or (2) further order of this court;

b. No performance, compliance or adherence of plaintiff to any term or condition of such chapters pursuant to this injunction shall constitute a waiver, estoppel or bar of any type against plaintiff in connection with its judicial challenge, if any, to that term or condition;

c. If at the time of the issuance of licenses pursuant to this injunction plaintiff shall not have theretofore complied with the requirements of any particular provisions of the specified chapters, then subsequent compliance within a reasonable time period, and in any event prior to the commencement of construction, shall be deemed to satisfy such provisions.

In the event that defendants, or either of them, should amend and/or modify the terms and/or conditions of the specified chapters, such amendments and/or modifications shall not become effective as against plaintiff unless and until this injunction shall have been modified to include such amended and/or modified terms and/or conditions.

Nothing contained in this injunction shall be construed to prevent enforcement against plaintiff of the terms and conditions of the specified code chapters or of any code, ordinance or statute not inconsistent with the contents hereof without the further approval and/or review of this court.

Nothing contained in this injunction or in the specified chapters shall be construed to prevent the application by plaintiff and/or defendants to this court for further review of the terms and conditions hereof as appropriate.

3. That plaintiff be awarded nothing by way of money damages against either or both defendants;

4. That any applications for award of statutory costs and/or attorneys' fees shall be served, filed and processed in accordance with the provisions of Rules 292 and 293 of Local Rules for the Eastern District of California."

APPENDIX A

SPECIAL VERDICT NO. __1__

(Not Given)

a. DID DEFENDANTS DENY PLAINTIFF'S REQUEST FOR
 PERMISSION TO CONSTRUCT AND OPERATE A CABLE
 TELEVISION SYSTEM IN THE SACRAMENTO METROPOLITAN
 AREA?

 YES _____ NO _____

SPECIAL VERDICT NO. __2__

a. WAS THE PREDOMINANT PURPOSE UNDERLYING DEFENDANTS' USE
 OF THE RFP (REQUEST FOR PROPOSAL) PROCESS TO LIMIT THE
 ABILITY OF CABLE OPERATORS TO EXPRESS THEIR VIEWS AND
 EXERCISE THEIR EDITORIAL JUDGMENT?

 YES _____ NO _____ NOT ANSWERED _X__

b. DID DEFENDANTS DENY PLAINTIFF PERMISSION TO CONSTRUCT
 AND OPERATE A CABLE TELEVISION SYSTEM BECAUSE DE-
 FENDANTS OPPOSE PLAINTIFF'S VIEWS?

 YES _____ NO _____ NOT ANSWERED _X__

c. WAS THE PREDOMINANT PURPOSE UNDERLYING DEFENDANTS' USE AND APPLICATION OF THE RFP PROCESS TO DISCOURAGE EXPRESSION OF ONE VIEWPOINT AND ADVANCE EXPRESSION OF ANOTHER?

YES _____ NO _____ NOT ANSWERED X

d. DOES THE RFP PROCESS APPLY EVENHANDEDLY (I.E. REGARDLESS OF VIEWPOINT) TO ALL ENTITIES DESIRING TO PROVIDE CABLE TELEVISION SERVICE?

YES _____ NO _____ NOT ANSWERED X

SPECIAL VERDICT NO. 3

a. HAVE DEFENDANTS LEFT OPEN AMPLE ALTERNATIVE CHANNELS OF COMMUNICATION FOR PLAINTIFF, AND PERSONS LIKE PLAINTIFF, WHO WISH TO EXPRESS THEIR VIEWS?

YES _____ NO X

SPECIAL VERDICT NO. 4

a. DID PLAINTIFF HAVE THE FINANCIAL AND TECHNICAL CAPABILITIES TO CONSTRUCT AND OPERATE A CABLE TELEVISION SYSTEM IN THE SACRAMENTO METROPOLITAN AREA?

YES X NO _____

1344

SPECIAL VERDICT NO. __5__

(Not Given)

a. DOES THE CONSTRUCTION AND OPERATION OF A CABLE
 TELEVISION SYSTEM INVOLVE THE USE OF PUBLIC
 RIGHTS OF WAY?

 YES _____ NO _____

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES," IS
 IT PROPER FOR DEFENDANTS TO REQUIRE THAT A CABLE
 COMPANY PAY FOR THE USE OF PUBLIC RIGHTS OF WAY?

 YES _____ NO _____

c. WERE THE PAYMENTS EXCESSIVE?

 YES _____ NO _____

 SPECIAL VERDICT NO. __6__

a. IS THE CAPACITY OF THE PUBLIC RIGHTS OF WAY AND
 UTILITY EASEMENTS IN THE SACRAMENTO METROPOLITAN
 AREA LIMITED TO ANY SIGNIFICANT DEGREE? IN OTHER
 WORDS, DID THE RIGHTS OF WAY AND EASEMENTS LACK
 SUFFICIENT ROOM FOR ALL CABLE COMPANIES WHO EITHER
 WANTED TO USE THEM OR MIGHT WANT TO USE THEM IN
 THE FUTURE?

 YES _____ NO __X__

SPECIAL VERDICT NO. ___7___

a. DOES THE CONSTRUCTION AND OPERATION OF A CABLE
 TELEVISION SYSTEM CAUSE SIGNIFICANT DISRUPTION IN
 THE USE OF PUBLIC PROPERTY?

 YES _____ NO ___X___

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
 DID DEFENDANTS' USE OF THE RFP PROCESS RESULT IN LESS
 DISRUPTION THAN WOULD OCCUR WITHOUT THE RFP PROCESS?

 YES _____ NO _____

c. WAS "DISRUPTION AND INCONVENIENCE" A SHAM USED BY
 DEFENDANTS AS A PRETEXT FOR JUSTIFYING THEIR RFP
 PROCESS?

 YES _____ NO ___X___

 SPECIAL VERDICT NO. ___8___

a. DOES THE CONSTRUCTION AND OPERATION OF A CABLE
 TELEVISION SYSTEM CAUSE SIGNIFICANT SAFETY HAZARDS
 TO BOTH THE PUBLIC AND WORKERS?

 YES _____ NO ___X___

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES," DID
 DEFENDANTS' USE OF THE RFP PROCESS RESULT IN FEWER
 SAFETY HAZARDS THAN WOULD OCCUR WITHOUT THE USE OF
 THE RFP PROCESS?

 YES _____ NO _____

c. WAS "SAFETY HAZARDS" A SHAM USED BY DEFENDANTS AS A
 PRETEXT FOR JUSTIFYING THE RFP PROCESS?

 YES _____ NO __X__

 SPECIAL VERDICT NO. __9__

a. DOES THE CONSTRUCTION AND OPERATION OF A CABLE
 TELEVISION SYSTEM SIGNIFICANTLY INTERFERE WITH THE
 ABILITY OF SACRAMENTO RESIDENTS TO USE THEIR PRIVATE
 PROPERTY?

 YES _____ NO __X__

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
 DID DEFENDANTS' USE OF THE RFP PROCESS RESULT IN LESS
 INTERFERENCE WITH PRIVATE PROPERTY THAN WOULD OCCUR
 WITHOUT THE RFP PROCESS?

 YES _____ NO _____

c. WAS "INTERFERENCE WITH ABILITY TO USE PRIVATE
 PROPERTY" A SHAM USED BY DEFENDANTS AS A PRETEXT
 FOR JUSTIFYING THEIR RFP PROCESS?

 YES _____ NO ___X___

 SPECIAL VERDICT NO. __10__

a. DOES THE CONSTRUCTION AND OPERATION OF A CABLE
 TELEVISION SYSTEM CAUSE ANY OF THE FOLLOWING TO
 A SIGNIFICANT DEGREE: NOISE, VISUAL CLUTTER,
 ENVIRONMENTAL AND/OR AESTHETIC PROBLEMS?

 YES _____ NO ___X___

b. IF YOUR ANSWER TO THE PREVIOUS QUESTION IS "YES,"
 DID DEFENDANTS' USE OF THE RFP PROCESS RESULT IN
 FEWER OF THESE IMPACTS THAN WOULD OCCUR WITHOUT THE
 USE OF THE RFP PROCESS?

 YES _____ NO _____

c. WAS "NOISE, VISUAL CLUTTER, AND/OR OTHER ENVIRONMENTAL
AND AESTHETIC IMPACTS" A SHAM USED BY DEFENDANTS AS
A PRETEXT FOR JUSTIFYING THEIR RFP PROCESS?

YES _____ NO __X__

SPECIAL VERDICT NO. __11__
(Not Given)

a. DOES THF CONSTRUCTION AND OPERATION OF A CABLE
TELEVISION SYSTEM CREATE SIGNIFICANT ADMINISTRATIVE
OR REGULATORY BURDENS FOR GOVERNMENT? (BURDENS ARE
"SIGNIFICANT" IF THEY ARE GREATER THAN THOSE WHICH
WOULD OCCUR USING THE ENCROACHMENT PERMIT PROCESS.)

YES _____ NO _____

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
DID DEFENDANTS' USE OF THE RFP PROCESS PROVIDE A
MORE EFFECTIVE MEANS OF MINIMIZING THE BURDENS THAN
THE ENCROACHMENT PERMIT PROCESS?

YES _____ NO _____

c. WAS "ADMINISTRATIVE AND REGULATORY BURDENS" A SHAM
USED BY DEFENDANTS AS A PRETEXT FOR JUSTIFYING
THEIR RFP PROCESS?

YES _____ NO _____

SPECIAL VERDICT NO. ___12___

a. IS "HEAD-TO-HEAD" COMPETITION AMONG CABLE TELEVISION
 SYSTEMS UNLIKELY TO OCCUR AND ENDURE IN THE SACRAMENTO
 MARKET? IN OTHER WORDS, IS CABLE TELEVISION A
 "NATURAL MONOPOLY" IN THE SACRAMENTO MARKET?

 YES _____ NO ___X___

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
 ARE THERE FEWER ADVERSE EFFECTS ASSOCIATED WITH
 HAVING A SINGLE PROVIDER OF CABLE TELEVISION AS A
 RESULT OF THE RFP PROCESS THAN THERE WOULD BE IN
 THE ABSENCE OF THE RFP PROCESS?

 YES _____ NO _____

c. WAS "NATURAL MONOPOLY" A SHAM USED BY DEFENDANTS AS
 A PRETEXT FOR GRANTING A SINGLE CABLE TELEVISION
 FRANCHISE?

 YES ___X___ NO _____

**1350**

d. WAS "NATURAL MONOPOLY" A SHAM USED BY DEFENDANTS TO PROMOTE THE MAKING OF CASH PAYMENTS AND PROVISION OF "IN KIND" SERVICES BY THE COMPANY ULTIMATELY SELECTED TO PROVIDE CABLE TELEVISION SERVICE TO THE SACRAMENTO MARKET?

YES __X__ NO _____

e. WAS "NATURAL MONOPOLY" A SHAM USED BY DEFENDANTS TO OBTAIN INCREASED CAMPAIGN CONTRIBUTIONS FOR LOCAL ELECTED OFFICIALS?

YES __X__ NO _____

SPECIAL VERDICT NO. __13__

a. DOES THE PUBLIC AS A WHOLE BENEFIT FROM EQUAL AND UNIFORM CABLE TELEVISION SERVICE THROUGHOUT THE SACRAMENTO COMMUNITY?

YES __X__ NO _____

b. DID THE RFP PROCESS ENCOURAGE EQUAL AND UNIFORM
 CABLE TELEVISION SERVICE TO A GREATER DEGREE THAN
 WOULD BE ACHIEVED IN THE ABSENCE OF THE RFP PROCESS?

 YES X NO _____

c. WAS "EQUAL AND UNIFORM CABLE TELEVISION SERVICE"
 A SHAM USED BY DEFENDANTS AS A PRETEXT FOR
 JUSTIFYING THEIR RFP PROCESS?

 YES _____ NO X

 SPECIAL VERDICT NO. __14__

a. DOES THE PUBLIC AS A WHOLE OBTAIN SIGNIFICANT BENEFITS
 FROM ANY OF THE FOLLOWING: ACCESS CHANNELS,
 PRODUCTION FACILITIES, TECHNICAL ASSISTANCE AND
 GRANTS?
 YES X NO _____

b. DID THE RFP PROCESS ENCOURAGE THE PROVISION OF THESE
 KINDS OF RESOURCES TO A GREATER EXTENT THAN WOULD BE
 PROVIDED IN THE ABSENCE OF THE RFP PROCESS?

 YES __X__ NO _____

c. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
 WERE DEFENDANTS MOTIVATED TO PROVIDE SUCH BENEFITS
 BY EITHER A DESIRE TO OBTAIN INCREASED POLITICAL
 INFLUENCE FOR ELECTED OR APPOINTED LOCAL OFFICIALS
 OR A DESIRE TO FAVOR LOCAL OFFICIALS' POLITICAL
 SUPPORTERS?

 YES __X__ NO _____

d. WAS THE PROVISION OF SUCH BENEFITS A SHAM USED BY
 DEFENDANTS AS A PRETEXT FOR JUSTIFYING THEIR RFP
 PROCESS?

 YES _____ NO __X__

SPECIAL VERDICT NO. __15__

a. DOES THE RFP PROCESS RESULT IN "BETTER" CABLE
 TELEVISION SERVICE, IN TERMS OF THE SYSTEM'S
 TECHNOLOGY, CAPABILITIES AND CHANNEL CAPACITY,
 THAN WOULD BE ACHIEVED WITHOUT THE RFP PROCESS?

 YES _____ NO __X__

b. WAS "SYSTEM TECHNOLOGY, CAPABILITY AND CHANNEL
 CAPACITY" A SHAM USED BY DEFENDANTS AS A PRETEXT
 FOR JUSTIFYING THEIR RFP PROCESS?

 YES _____ NO _____ NOT ANSWERED __X__

SPECIAL VERDICT NO. __16__

a. DOES THE PUBLIC HAVE A SIGNIFICANT INTEREST IN THE
 FINANCIAL QUALIFICATIONS OR BACKGROUND OF ANY COMPANY
 CONSTRUCTING AND OPERATING A CABLE SYSTEM IN
 SACRAMENTO? (THE PUBLIC'S INTEREST IS SIGNIFICANT
 IF, AMONG OTHER THINGS, CONSUMERS WOULD RECEIVE
 REDUCED LEVELS OF CABLE SERVICES AND TECHNOLOGY
 IF GOVERNMENT DID **NOT** INQUIRE INTO THE FINANCIAL
 CAPABILITIES OF CABLE OPERATORS.)

 YES __X__ NO _____

1354 

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
DOES THE RFP PROCESS PROMOTE THIS INTEREST?

YES __X__ NO _____

c. WAS "FINANCIAL QUALIFICATIONS" A SHAM USED BY
DEFENDANTS AS A PRETEXT FOR JUSTIFYING THEIR RFP
PROCESS?

YES _____ NO __X__

SPECIAL VERDICT NO. __17__

a. DOES THE PUBLIC HAVE A SIGNIFICANT INTEREST IN THE
TECHNICAL QUALIFICATIONS OR BACKGROUND OF ANY
COMPANY CONSTRUCTING OR OPERATING A CABLE TELEVISION
SYSTEM IN SACRAMENTO? (THE PUBLIC'S INTEREST IS
SIGNIFICANT IF, AMONG OTHER THINGS, CONSUMERS WOULD
RECEIVE REDUCED LEVELS OF CABLE SERVICES AND
TECHNOLOGY IF GOVERNMENT DID NOT INQUIRE INTO THE
TECHNICAL CAPABILITIES OF CABLE OPERATORS.)

YES __X__ NO _____

b. IF YOUR ANSWER TO THE PRECEDING QUESTION IS "YES,"
 DOES THE RFP PROCESS PROMOTE THIS INTEREST?

 YES _____ NO __X__

c. WAS "TECHNICAL QUALIFICATIONS" A SHAM USED BY
 DEFENDANTS AS A PRETEXT FOR JUSTIFYING THEIR
 RFP PROCESS?

 YES _____ NO __X__

 SPECIAL VERDICT NO. __18__

 UNDER THE INSTRUCTIONS ON DAMAGES GIVEN TO YOU, WHAT
AMOUNT OF DAMAGES, IF ANY, SHOULD BE AWARDED TO PLAINTIFF?

1356

ANSWER "Zero"_____

DATED:

_____
 Foreperson